**Arlo TATUM, Central Committee for Conscientious Objectors, et al., Appellants,**

v.

**Melvin R. LAIRD, Secretary of Defense, et al.**

**No. 24203.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 20, 1971.

Decided April 27, 1971.

MacKinnon, Circuit Judge, concurred in part, dissented in part, and filed opinion.

Mr. Frank Askin, Newark, N. J., of the bar of the Supreme Court of New Jersey, pro hac vice, by special leave of Court, with whom Messrs. Melvin L. Wulf, New York City, and Lawrence Speiser, Washington, D. C., were on the brief, for appellants. Mrs. Hope Beth Eastman, Washington, D. C., also entered an appearance for appellants.

Mr. Robert L. Keuch, Atty., Department of Justice, with whom Messrs. J. Walter Yeagley, Asst. Atty. Gen., at the time the brief was filed, Kevin T. Maroney and George W. Calhoun, Attys., Department of Justice, were on the brief, for appellees. Mr. Benjamin Flannagan, Atty., Department of Justice, also entered an appearance for appellees.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

On 17 February 1970, appellants, on behalf of themselves and others similarly situated, filed suit challenging the legality of what appellants term "surveillance of lawful civilian political activity by the U.S. Army," which appellees describe as "gathering by lawful means, * * * maintaining and using in their intelligence activities, any information relating to potential or actual civil disturbances [or] street demonstrations." Appellants sought a declaratory judgment that the Army's present conduct is unconstitutional or otherwise illegal, concomitantly an injunction forbidding future similar activity, and the destruction of all such data hitherto illegally obtained. The United States District Court

denied the requested relief and granted appellees' motion to dismiss on the basis of pleadings, affidavits, and oral argument, without testimony of witnesses.

Appellants claim that the Army's intelligence work involves undercover operations by military agents within the civilian community and organizations, maintenance of records at over a dozen regional and national record centers, and distribution to military units and to criminal investigative agencies of lists describing individuals and organizations who have publicly objected to governmental policies. Appellants claim that these domestic activities of the Army go far beyond any legitimate military need, exceed the Army's statutory authority, inhibit political participation and debate, and deprive appellants and others similarly situated of the constitutional rights guaranteed by the First, Fourth, Fifth and Ninth Amendments, *i. e.*, the right to free speech and association, and the right to petition the government for redress of grievances, and the right of privacy.

Appellees assert the constitutional and statutory authority and duty of the President to use such of the Armed Forces as he deems necessary to suppress any insurrection or domestic violence, and point to Defense Department directives regarding the planning for and employment of military resources in the event of civil disturbances, under which one of the responsibilities of the Army is to provide "essential planning, operational and intelligence data to the national military command center and to military service command centers on a timely basis to insure that the national command authorities and appropriate military service command authorities are adequately informed."

For reasons stated hereafter, we find that this court and the District Court have jurisdiction, that there is a justiciable controversy, and that appellants have stated a claim in relation thereto. We therefore remand the case to the District Court for ascertaining essential relevant facts and the determination thereupon of whether any rights of the appellants have been infringed by any actions of the appellees which may be proved.

## I. JURISDICTION

Appellants' complaint in the District Court alleged jurisdiction to be based upon the existence of a federal question as contemplated by 28 U.S.C. § 1331 and the requisite $10,000 in controversy. On this appeal [1] the Government contests the allegation of jurisdictional amount, contending that:

There is no evidence in the record that any of the plaintiffs have a claim in fact for any amount of money, much less a claim for an amount in excess of $10,000.

In response to this argument, appellants in essence admit that their claim is not capable of valuation in monetary terms, but argue essentially that where a challenge to a claimed deprivation of fundamental constitutional rights of intangible value is involved, the purposes for the jurisdictional amount requirement [2] are inapplicable and that such requirement should therefore not be applied to defeat federal jurisdiction. While there have been mounting expres-

[1]. No claim of lack of subject matter jurisdiction was raised in the Government's motion to dismiss in the District Court. This, of course, is no bar to the raising of the issue on appeal. Louisville & Nashville R. R. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

[2]. The purposes of the jurisdictional amount requirement are, appellants assert, twofold: first, the promotion of federalism by confining federal courts strictly within the limits of their jurisdiction as prescribed by Congress; and, second, the avoidance of consuming the resources of the federal courts in the resolving of "petty" controversies. *See* Healy v. Ratta, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248 (1934), and S.Rep. No.1830, 85th Cong., 2d Sess. (1958). Neither of these purposes, appellants insist, would be served by denying jurisdiction in the instant case.

sions of judicial concern over this seeming gap, caused by the jurisdictional amount requirement, in the power of the federal courts to entertain federal question cases of this nature, we find it unnecessary to reach this question in the instant case.[3]

As we recently held in Peoples v. United States Department of Agriculture:[4]

The District Court for the District of Columbia has an independent source of jurisdiction in the legislation, passed by Congress, and codified in the District of Columbia Code, 11 D.C. Code § 521, which gives that court general equity jurisdiction, and venue where either party is a resident or found within the District of Columbia. This permits actions for declaratory judgment as well as injunction to be maintained against those whose office in the Federal Government establishes their official residence in the District. Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944); Nestor v. Hershey [138 U.S.App.D.C. 73], 425 F.2d 504, at 521–523 (1969).[5]

3. *See* Wolff v. Selective Service Local Board No. 16, 372 F.2d 817, 826 (2d Cir. 1967); Fein v. Selective Service System Local Board No. 7, 430 F.2d 376, 380 (2d Cir. 1970) (dissenting opinion); Giancana v. Johnson, 335 F.2d 366, 371 (7th Cir. 1965) (dissenting opinion); Murray v. Vaughn, 300 F.Supp. 688 (D.R.I.1969); Boyd v. Clark, 287 F.Supp. 561, 567 (S.D.N.Y.1968) (dissenting opinion). The American Law Institute has recommended the abolition of the amount in controversy requirement in federal question cases precisely because:
   The few cases there are * * * that must satisfy the § 1331 requirement are likely to involve matters particularly deserving of a federal forum. * * * Cases in which the plaintiff claims violation of his constitutional rights by action of a federal official warrant federal cognizance without the need of demonstrating that the requisite amount is in controversy.
   ALI, Study of the Division of Jurisdiction Between State and Federal Courts, 172 (1969). *See also* C. Wright, Federal Courts, § 32 at 110 (1969); Currie, The Federal Courts and the American Law Institute (Part II), 36 U.Chi.L.Rev. 268, 292 (1969).

4. 138 U.S.App.D.C. 291, 294, 427 F.2d 561, 564 (1970).

5. Where a suit seeks equitable relief, and no claim involving personal property, or for debt or damages is made, the District Court for the District of Columbia has "original jurisdiction" without regard for the amount in controversy. *See* Norden v. Royall, 90 F.Supp. 834, 835 (D.D.C.1949); Paton v. District of Columbia, 180 A.2d 844 (D.C.Mun.App. 1962); Friedman v. District of Columbia, 155 A.2d 521 (D.C.Mun.App.1959); Byse & Fiocca, "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308, 325 (1967); 11 D.C.Code §§ 521, 961. Of course, when the District Court entertains such a suit it is exercising powers analogous to those of a state court of general jurisdiction. Western Urn Mfg. Co. v. American Pipe and Steel Corp., 109 U.S. App.D.C. 145, 284 F.2d 279 (1960); King v. Wall & Beaver Street Corp., 79 U.S.App.D.C. 234, 145 F.2d 377 (1944); Boardman v. Martocchia, 216 F.Supp. 830 (D.D.C.1963). And it is unclear whether such a state court would have the power to issue an injunction against a federal officer. *See* Arnold, The Power of State Courts to Enjoin Federal Officers, 73 Yale L.J. 1385 (1964). Nevertheless, it is clear that the reasons creating the doubt as to state courts' power in this respect, stemming from considerations of federal supremacy, do not apply to the District Court for the District of Columbia, which is itself a constitutionally based Article III federal court, albeit one additionally endowed with unique general powers, pursuant to Article I, § 8. *See* O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933).
   The foregoing analysis is not affected by the enactment of the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358 (29 July 1970) 84 Stat. 473, Title I of which establishes the new Superior Court of the District of Columbia as a court of general jurisdiction equivalent to a state court of similar powers. The instant suit was filed before the 1 February 1971 effective date of the new Act, and therefore properly remains within the jurisdiction of the United States District Court as provided by prior law. District of Columbia Court Reorganization Act of 1970, § 111, 84 Stat. 476,

Furthermore, we note that since the Government did not contest the existence of the alleged jurisdictional amount in the District Court, appellants had no opportunity to attempt to sustain their allegation that $10,000 was in controversy, an endeavor at which they might well be successful under the doctrine that, particularly where purely injunctive relief is sought, the amount in controversy may be measured by either "the value of the right sought to be gained by the plaintiff * * * [or] the cost [of enforcing that right] to the defendant. * * * *"[6] In the instant case, it seems likely that if all the relief sought by appellants were granted, including enjoining the operation of the Army's civilian intelligence system and the production and destruction of all records pertaining

thereto "maintained by any and all military agencies within the United States and overseas," the cost to the Army of complying with such a decree might well exceed $10,000.

Thus even apart from the applicability of 11 D.C.Code § 521, since we have found as detailed subsequently that appellants have otherwise stated an adequate and justiciable claim for relief, we would be constrained to permit appellants on remand the opportunity to meet their burden of satisfying the District Court that the requisite amount is in controversy.[7]

■ For the foregoing reasons we reject the Government's claim that the dismissal should be affirmed for lack of subject matter jurisdiction.[8]

---

*to be codified as* D.C.Code Ann. § 11–501(1). *See* Williams, District of Columbia Court Reorganization, 1970, 59 Geo.L.J. 483, 540–542 (1971).

6. Hedberg v. State Farm Mutual Automobile Ins. Co., 350 F.2d 924 (8th Cir. 1965) (Blackmun, J.) (dictum). A succinct and oft-quoted statement of this doctrine was put forth by the 10th Circuit in Ronzio v. Denver & R. G. W. R. R., 116 F.2d 604, 606 (10th Cir. 1940), as follows:

   In determining the matter in controversy, we may look to the object sought to be accomplished by the plaintiffs' complaint; the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce.

   *See* Hatridge v. Aetna Casualty & Surety Co., 415 F.2d 809, 814–816 (8th Cir. 1969). *Compare* C. Wright, Federal Courts, §§ 34, 117–119 (1969), where the rule allowing the cost to the defendant to be considered is stated to be the "desirable" one, *with* J. Moore, Federal Practice ¶ 0.91 [1] (2d ed. 1964), where the rule is characterized as "contrary" to the prevailing view. While the Supreme Court has never directly passed on this question, *compare* St. Paul Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938), *with* Horton v. Liberty Mutual Ins. Co., 367 U.S. 348, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961), a number of lower federal courts have permitted the cost to the defendant to control the jurisdictional amount issue, *see* cases cited in

Wright and Moore, *supra*. And the Supreme Court's willingness to entertain, without discussion of the jurisdictional basis, the appeal of a federal taxpayer seeking to enjoin the operation of portions of the federal Elementary and Secondary Education Act of 1965 as violating the Establishment and Free Exercise Clauses of the First Amendment, Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), may well be indicative of the Court's view that jurisdictional amount may appropriately be established from the defendant's viewpoint in certain cases. The Court in *Flast*, in its discussion of the standing issue, noted that "the challenged program involves a substantial expenditure of federal tax funds," 392 U.S. at 103, 88 S.Ct. at 1954, while nowhere mentioning any alleged monetary value of the plaintiff's claim.

7. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1935). In establishing that the amount in controversy exceeds $10,000, "[a]bsolute certainty * * * is not essential. * * * Present probability that [the cost to the defendant] will exceed that sum is enough." Friedman v. International Association of Machinists, 95 U.S.App.D.C. 128, 220 F.2d 808 (1955).

8. Appellants' complaint did not refer to 11 D.C.Code § 521 as a basis for jurisdiction of their claim. However, at argument, appellants moved pursuant to 28 U.S.C. § 1653 to amend their complaint to include § 521 in their jurisdictional

## II. JUSTICIABLE CONTROVERSY

In recent years the Army and the National Guard have been called upon to act to preserve domestic peace against violent protests leading to civil disorders, a role for the military which was not unforeseen in our Constitution.[9] Many violent protests were aimed directly at military functions and installations themselves, as in ransacking Selective Service offices, barring troop and supply trains by prostrate bodies on the tracks, unlawful attempts to enter military bases or demonstrations thereon, and harassment of defense-oriented businesses. In executing other missions the Army confronted riotous mobs protesting matters unrelated to military operations, for example, the tragic riots in Detroit, Newark, and other of our large cities. During the period 1967–68 the National Guard was called upon eighty-three times and the Army four times to quell cases of civil disorder.

While these statistics relate to the period of civil disorders during which the Army operated the intelligence system which appellants complain violated their rights, we also note that in the period beginning with the use of the Army paratroops at Little Rock in 1957 the Army has been called upon under re-

lated constitutional and statutory provisions to preserve civil peace in order that certain groups might exercise their constitutional rights. The moral of this is that no matter who the persons or groups are giving voice to their protests against the established order, civil disturbance of one kind or another is likely to ensue; and, irrespective of the content or cause of the protest, the military need certain intelligence information to perform their mission "to enforce the laws of the United States" or "suppress * * * insurrection."[10]

In performing this type function the Army is essentially a police force or the back-up of a local police force. To quell disturbances or to prevent further disturbances the Army needs the same tools and, most importantly, the same information to which local police forces have access. Since the Army is sent into territory almost invariably unfamiliar to most soldiers and their commanders, their need for information is likely to be greater than that of the hometown policeman.

No logical argument can be made for compelling the military to use *blind* force. When force is employed it should be intelligently directed, and this depends upon having reliable information —in time. As Chief Justice John Mar-

---

allegations. Section 1653 provides as follows: "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." Under this section, "either this Court or the District Court on remand, has power to permit amendment to avoid dismissal under jurisdictional grounds." Jones v. Freeman, 400 F.2d 383, 387 (8th Cir. 1968). The statute is to be construed liberally in accordance with the congressional intent to provide a means for avoiding the dismissal of suits on technical grounds. John Birch Society v. National Broadcasting Co., 377 F.2d 194 (2d Cir. 1967); Moore v. Coats Co., 270 F.2d 410 (3rd Cir. 1959). Accordingly, we direct that upon remand of this action appellants be permitted to amend their complaint to allege jurisdiction resting upon 11 D.C.Code § 521.

9. U.S.Const. art. I, § 8, cls. 14, 15, 16; art. II, § 2, cl. 1; art. 4, § 4. Article I, § 8 assigns the Power to Congress to

define the role of the military in national affairs. The military must therefore confine its activities to those necessary to carry out its functions provided by statute.

10. 10 U.S.C. §§ 331, 332, 333 (1964). We note, however, that the operation of the intelligence system challenged herein is not sought to be justified by any need to obtain information for the use of the National Guard. At oral argument appellees admitted that no such information has been provided to the Guard on the occasions of its deployment during 1967–68, and would not be provided unless the Guard were called into federal service. With respect to the use of the Guard in Federal service, article 1, § 8, cl. 15 of the Constitution empowers Congress "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions."

shall said of Washington, "A general must be governed by his intelligence and must regulate his measures by his information. It is his duty to obtain correct information; * * *."[11] So we take it as undeniable that the military, i. e., the Army, need a certain amount of information in order to perform their constitutional and statutory missions.[12] The questions are what type of information the military need, how they should go about obtaining it, when they need it, and whether what the Army has done here has infringed any of appellants' rights.

So much for the military's mission and intelligence necessity. As for appellants' contention that their rights, constitutional or otherwise, have been infringed, they have some difficulty in establishing visible injury, at least on this incomplete record. Appellants freely admit that they complain of no specific action of the Army against them, only the existence and operation of the intelligence gathering and distributing system, which is confined to the Army and related civilian investigative agencies. There is no evidence of illegal or unlawful surveillance activities. We are not cited to any clandestine intrusion by a military agent. So far as is yet shown, the information gathered is nothing more than a good newspaper reporter would be able to gather by attendance at public meetings and the clipping of articles from publications available on any newsstand.

Thus the instant case, at this juncture, involves no concrete, identifiable sanctions, no compelled self-identification (except to the extent that the Army may attend meetings thought to be for a faithful few), and no threat of publication. Turning to the authorities claimed to be relevant here, virtually all of the First Amendment cases cited where government activity was enjoined or struck down fall into one of three categories:

(1) Cases where some legal or criminal sanction was imposed or threatened to be imposed on persons who exercised their First Amendment rights.[13]

(2) Cases involving some element of government compulsion, either to testify regarding one's political ideas or beliefs, or to identify oneself in order to exercise First Amendment rights.[14]

(3) Situations where the Government threatens to publicize the names of allegedly politically controversial persons for the purpose of inhibiting

11. Foreword, U.S. Army Basic Field Manual, Vol. X, circa 1938.

12. The President's National Advisory Commission on Civil Disorders recommended:
   Intelligence—The absence of accurate information both before and during a disorder has created special control problems for police. Police departments must develop means to obtain adequate intelligence for planning purposes, as well as on-the-scene information for use in police operations during a disorder.

13. E. g., United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (criminal prosecution or loss of employment); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (criminal prosecution); N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (criminal prosecu-

tion, disbarment); National Student Association v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103 (1969) (draft reclassification).

14. E. g., Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (compelling affirmative act of requesting delivery of mail thought by the Post Office to be communist propaganda); Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (requiring identity on political handbill); N. A. A. C. P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (requiring filing of membership lists); Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), and Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957) (compelling testimony).

**954**

the exercise of their First Amendment rights.[15]

In view of the distinctions in this case from prior decisions, appellees argue that no justiciable controversy exists, i. e., that nothing has been done, that nothing is contemplated to be done, and even if some action by the Army against appellants were possibly foreseeable, such would not present a presently justiciable controversy.

This position of the appellees does not accord full measure to the rather unique argument advanced by appellants. While appellants do indeed argue that in the future it is possible that information relating to matters far beyond the responsibilities of the military may be misused by the military to the detriment of these civilian appellants, yet appellants do not attempt to establish this as a definitely foreseeable event, or to base their complaint on this ground. Rather, appellants contend that the *present existence of this system* of gathering and distributing information, allegedly far beyond the mission requirements of the Army, constitutes an impermissible burden on appellants and other persons similarly situated which exercises a *present inhibiting effect* on their full expression and utilization of their First Amendment rights of free speech, etc. The baleful effect, if there is one, is thus a present inhibition of lawful behavior and of First Amendment rights.[16]

■ Under this view of appellants' allegations, under justiciability standards [17] it is the operation of the system

---

15. Hentoff v. Ichord, 318 F.Supp. 1175 (D.D.C.1970).

16. "The peculiar feature of suits alleging a First Amendment chilling effect * * * is that if the allegation is correct, immediate and real injury is done to the plaintiff's interest if he *does not* speak or act as he says he wants to." National Student Association v. Hershey, 134 U.S.App.D.C. 56, 64, 412 F.2d 1103, 1111 (1969). If the Army's intelligence system causes such injury it may be enjoined if the system in operation exceeds the authority granted by Congress, *see* Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) and notes 9 and 10, *supra,* or, if within its statutory authority, it nevertheless creates more than an "incidental" burden on First Amendment Rights, and thus violates the Constitution. *See* United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

17. To "allege the sort of 'case' or 'controversy' referred to in Article III of the Constitution, the source of jurisdiction of the federal courts, * * * the complaint must show that there exists a controversy between the parties with such immediacy and presently adversary character as to require its adjudication." Davis v. Ichord, 143 U.S.App.D.C. ——, 442 F.2d 1207 (1970).

To the extent that the Army's argument against justiciability here includes the claim that appellants lack standing to bring this action, we cannot agree. If the Army's system does indeed derogate First Amendment values, the appellants are persons who are sufficiently affected to permit their complaint to be heard. The record shows that most if not all of the appellants and/or the organizations of which they are members have been the subject of Army surveillance reports and their names have appeared in the Army's records. Since this is precisely the injury of which appellants complain, they have standing to seek redress for that alleged injury in court and will provide the necessary adversary interest that is required by the standing doctrine, on the issue of whether the actions complained of do in fact inhibit the exercise of First Amendment rights. Nor should the fact that these particular persons are sufficiently uninhibited to bring this suit be any ground for objecting to their standing. *See* N. A. A. C. P. v. Alabama, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Anderson v. Sills, 56 N.J. 210, 265 A.2d 678, 684 (1970).

Nor does the recent group of Supreme Court decisions limiting the situations in which federal courts may enjoin court criminal proceedings require a different result. *See* Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), Boyle v. Landry, 401 U.S. 58, 91 S.Ct. 764, 27 L.Ed.2d 683 (1971), and related cases decided the same day. Those cases rest firmly on concepts of Federalism and comity not present in the instant appeal. In *Younger* where certain of the plaintiffs sought standing to attack alleged unconstitutional state statutes on

itself which is the breach of the Army's duty toward appellants and other civilians.[18] The case is therefore ripe for adjudication. Because the evil alleged in

First Amendment grounds, because they claimed to "feel inhibited" by the existence of such laws, the Court stated:

> We do not think this allegation, even if true, is sufficient to bring the equitable jurisdiction of the federal courts into play to *enjoin a pending state prosecution.* A federal lawsuit to stop a prosecution in a state court is a serious matter. And persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs *in such cases.* (Emphasis added.)

The Court went on to hold that even one who has been indicted under a constitutionally suspect state law may not ordinarily seek federal injunctive relief because of the "long standing public policy against federal court interference with state court proceedings * * *." And in *Boyle,* where "[n]ot a single one of the citizens who brought [the] action had ever been prosecuted, charged, or even arrested under the particular * * * statute which the court below held unconstitutional," the Supreme Court relied on its discussion of the requirements of Federalism in *Younger* to conclude that:

> the normal course of state criminal prosecutions cannot be disrupted or blocked on the basis of charges which in the last analysis amount to nothing more than speculation about the future. *The policy of a century and a half against interference by the federal courts with state law enforcement* is not to be set aside on such flimsy allegations as those relied upon here. (Emphasis added.)

Aside from the fact that, as we have related *supra,* appellants here complain of present injury and not merely speculative future injury, we are not faced in this case with any considerations similar to the policy against federal interference in state court actions which the Supreme Court found controlling in *Younger* and *Boyle.* Furthermore, and highly important here, appellants do not have the "adequate remedy at law" available to the plaintiffs in *Younger* and *Boyle,* in the form of the opportunity to present their constitutional claims to the state court, which the Supreme Court also relied on as a basis for restricting the exercise of federal equitable jurisdiction in such cases.

18. The analysis of justiciability questions in terms of whether there has been a

breach of a judicially identifiable "duty" stems from the Supreme Court's discussion in Baker v. Carr, 369 U.S. 186, 198, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and Powell v. McCormack, 395 U.S. 486, 517, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491 (1969). In the latter case the Court, quoting in part from *Baker,* said:

> In deciding generally whether a claim is justiciable, a court must determine whether "the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded."

The Army has both a duty not to exceed its statutory authority and not to infringe First Amendment rights. Appellants claim the Army is doing both; their claim is therefore now justiciable, since "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests of sufficient immediacy and reality to warrant" judicial resolution. Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969), quoting from Maryland Casualty Co. v. Pacific Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). That the Army has a legitimate need for certain information need not be denied. The claim here is that in the operation of its intelligence system the Army has gone beyond any legitimate need for information, and in doing so has created a present chilling effect on the "transcendent" values enshrined in the First Amendment. Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). *See* note, The Chilling Effect in Constitutional Law, 69 Colum.L.Rev. 808, 809 (1969) for a discussion of the "substantive" significance of the chilling effect doctrine as relied upon by appellants here. The "judicial determination" of this alleged breach of duty is attainable by identifying those areas in which the Army's activity goes beyond that reasonably relevant to its statutory mission requirements, assuming, of course, that limitation of the Army's system to the extent found reasonably relevant to its civil disorder mission would not itself represent a significant intrusion into the protected First Amendment area. *Cf.* United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). That this latter assumption is likely to be valid is seen from documents in this record indicating that the Army may have

the Army intelligence system is that of overbreadth, *i. e.*, the collection of information not reasonably relevant to the Army's mission to suppress civil disorder,[19] and because there is no indication that a better opportunity will later arise to test the constitutionality of the Army's action, the issue can be considered justiciable at this time.

Only recently this court decided *Davis v. Ichord,* in which an attack was made on the maintenance and potential use of files on political dissenters by the House Internal Security Committee. This court there held that no case or controversy was presented because the appellants had failed to establish standing to attack the present use of the files and did not show any concrete indication that the Committee's files would be used against anyone in the future. Nevertheless, this court in *Davis* did indicate that "among the considerations pertinent to determining the existence of a chilling effect upon the exercise of First Amendment rights which give rise to a case or controversy are the *source of the chill,* the extent to which it focuses upon the conduct of those who allege it, and the likelihood that it will affect that conduct." The court in *Davis* was concerned with the "source of the chill" in order to determine whether the threat of *future* in-

jury was sufficiently substantial to provide the necessary ripeness to the controversy.

■ Nevertheless, in view of this country's long-established tradition against military involvement in civilian politics, we think it significant that here the "source of the chill" is the Army, as opposed to the situation in *Davis* where the House Committee could point to a legal basis for the collection of such files pursuant to its designated function to investigate propaganda. We think the Army has a legal basis for the collection of intelligence information relevant to its constitutional and statutory mission, but on the record before us we cannot say that the intelligence system as designed and operated does not go beyond that which would be justified by the Army's mission. The Army system here is apparently of a much broader scope than the files involved in *Davis*, and we held in *National Student Association v. Hershey*[20] that "the severity and scope of the alleged chilling effect on First Amendment freedoms" is a factor to be considered in determining justiciability. It is arguable that the existence of a system with the broad scope as alleged by appellants would affect the conduct of persons in the class that appellants claim to represent.[21]

modified its policy and now views its information requirements as limited to "reports concerning outbreaks of violence or incidents with a high potential for violence beyond the capability of state and local police and the National Guard to control." Letter from Under Secretary of the Army Thaddeus R. Beal to Senator Sam J. Ervin, 20 March 1970 (App. 84, 88). In spite of this recent self-limitation, however, appellants have alleged the actual operation of a system of much broader scope and, further, that previously collected information is still retained in various Army files. We therefore think that the appellants should be allowed to develop fully their contention that the Army collects and maintains information on civilian political activity in excess of its mission requirements, and the Army should have the opportunity to show the relevance of its intelligence data to its civil disorder mission.

19. "The free exercise of First Amendment rights is perhaps more readily inhibited by a [policy] justifiably suspect as vague or overbroad, because of the uncertainty of its application. * * *" Davis v. Ichord, 143 U.S.App.D.C. ——, 442 F.2d 1207, at 1214 (1970).

20. 134 U.S.App.D.C. 56, 68, 412 F.2d 1103, 1115 (1969).

21. The dissent suggests that the instant suit may not be appropriate for treatment as a class action under Rule 23, Fed.R.Civ.P. While we recognize that the nature of the appellants' claims and the potentially large number of persons they propose to represent pose difficult questions as to the amenability of their claims to Rule 23 treatment, this question was not considered by the trial court, has not been argued by the parties, and is not presented in the instant appeal. We therefore do not pass on it here. On remand, the trial court will

Referring to our holding in *Davis* that the "source of the chill" is important in determining whether there is any inhibiting effect on the exercise of First Amendment rights, we think that there is a significant difference between investigative actions taken by a military agency in reference to civilians and similar investigative actions taken by a regular investigative agency of a civilian branch of the Government.[22]

One of the functions of a civilian investigative agency, such as the Federal Bureau of Investigation, is to compile information on law violators, agitators of violence, and possible subversives. It has always been recognized that this is a delicate function, and it is exercised under the direction of the Attorney General. Investigation is performed by men a majority of whom are lawyers or who have had considerable legal training, under the direction of lawyers in the Justice Department, and the information compiled is only usable and effective through court action. The FBI is powerless to imprison anyone or to affect his

liberty in any way except through the action of the courts.

The Army or other military, in contrast, are not concerned with law violations. And, in sharp distinction to the FBI and other investigative agencies, they definitely command their own force to exercise at the will of their own commanders. The military are not accustomed to effecting their will through courts and legal processes. Indeed, the employment of military personnel in civil disorders itself implies at least a partial breakdown of law and order, a breakdown of normal processes of law through courts.

The compilation of data by a civilian investigative agency is thus not the threat to civil liberties or the deterrent on the exercise of the constitutional right of free speech that such action by the military is, because a civil investigative agency has no inherent power to act against an individual, that power always being subject to the well-defined restrictions of law and the approval of the courts. The military have no such re-

have the opportunity, illuminated by the arguments of the parties, to determine to what extent the class treatment of appellants' claims is appropriate. In this connection we note the considerable flexibility afforded the trial judge under Rule 23 to treat the suit as a partial class action (Rule 23(c) (4) (A)), establish subclasses (Rule 23(c) (4) (B)), and to defer final decision on class action issues until after discovery or further development of the factual bases for the claims alleged. *See* 3B J. Moore, Federal Practice, ¶ 23.45 [1] at 23–707 (1969). This latter course would seem particularly appropriate here, where because of the very nature of the system alleged to be the cause of the complained of injury, the full facts with respect to the scope of its operation and the numbers of persons affected thereby, are, at the present state of the proceedings, primarily within the exclusive knowledge of the defendants.

We further note, in response to the concerns expressed by the dissent, that the fact that a proposed class contains a great number of members does not itself necessarily preclude class action treatment, Eisen v. Carlisle & Jacquelin,

391 F.2d 555 (2d Cir. 1968), nor, in suits seeking injunctive or declaratory relief, is the court necessarily required to look into the particular circumstances of each member of the proposed class in determining whether class action treatment is appropriate. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 937 (2d Cir. 1968).

22. On oral argument counsel for appellants admitted that there is a material difference in the impact of the same intelligence gathering and distribution, depending on whether it is performed by the military or by civilian investigative agencies such as the FBI. Counsel was unwilling to concede that, as to content, any of the information complained of could be compiled by either type agency, not even to the extent of compiling a list of previously convicted fomenters of civil disturbance; and as to time, counsel asserted that such information as was compiled should be given on the spot to the military force by a civilian agency. So extreme a limitation on the gathering and timely dissemination of any information would render it useless.

strictions; they have their own force (of incomparable power), they have their own commanders trained as soldiers not lawyers, the military's vast size may make civilian control of individual or small unit actions more theoretical than actual, and the military is not accustomed to operating within the restrictions of law and the processes of courts.[23]

It is highly important for the safety of the country that to the extent consonant with the performance of the military's mission a separation of sensitive information and military power be maintained, as a separation of match and powder. In an emergency or anticipation of an emergency the military power can be supplied the necessary information from civilian investigative agencies; these two ingredients, potentially dangerous when combined, can be put together by a responsible President and his Cabinet officers as the emergency demands. But to permit the military to exercise a totally unrestricted investigative function in regard to civilians, divorced from the normal restrictions of legal process and the courts, and necessarily coupling sensitive information with military power, could create a dangerous situation in the Republic.

█ The appellants have not had an opportunity to establish (and may never establish) their far-sweeping claims as to the character of the information gathered and the operation of the system established by the Army. We were informed by appellees' counsel on oral argument that on 6 March 1970 the Secretary of the Army by directive to the Chief of Staff limited the intelligence activities here complained of and directed the personnel responsible to concentrate on the more important and likely sources and locales of violence. Apparently in the judgment of the civilian head of the Army not everything being done in the operation of this intelligence system was necessary to the performance of the military mission. If the Secretary of the Army can formulate and implement such judgment based on facts within his Departmental knowledge, the United States District Court can hear evidence, ascertain the facts, and decide what, if any, further restrictions on the complained-of activities are called for to confine the military to their legitimate sphere of activity and to protect appellants' allegedly infringed constitutional rights. Appellants have, therefore, stated a claim upon which relief can be granted.

### III. REMAND

Having found that this court and the District Court have jurisdiction, that a justiciable controversy exists, and that appellants have stated a claim upon which relief could be granted, we think the record now before us is much too incomplete for a court to determine the ultimate questions of whether the Army has infringed any rights of the appellants and whether appellants are entitled to any injunctive relief. We therefore remand the case to the District Court for the determination of the following principal (and any related) points:

1. The nature of the Army domestic intelligence system made the subject of appellants' complaint, specifically the extent of the system, the methods of gathering the information, its content and substance, the methods of retention and distribution, and the recipients of the information.

---

23. *Cf.* National Student Association v. Hershey, 134 U.S.App.D.C. 56, 71, 412 F.2d 1103, 1118 (1969), where, in a suit challenging a Selective Service policy as inhibitive of First Amendment rights we said:

> It is no reflection on the competence or integrity of selective service personnel to observe that they are ill-equipped to determine questions of law as delicate and complex as those commonly raised by anti-war protest activity. Draft boards do not employ judicial procedures, and their members often have no legal training. Rightly or not, registrants are also likely to have less confidence in the constitutional sensitivity of their draft board, especially in the area of war dissent, than in that of the prosecutor and the courts.

2. What part, if any, of the Army domestic intelligence gathering system is unrelated to or not reasonably necessary to the performance of the mission as defined by the Constitution, statutes, military regulations, and as interpreted by actions under those written definitions of the mission.[24]

3. Whether the existence of any overbroad aspects of the intelligence gathering system, as determined above, has or might have an inhibiting effect on appellants or others similarly situated.

4. Such relief as called for in accordance with the above established law and facts.

Reversed and remanded.

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

While I concur in many of the pronouncements in the majority opinion I respectfully dissent from the result. My opinion is based on the facts of the case which emerge from the pleadings, affidavits and the admissions made to the trial court. In the hearing before the trial judge, counsel admitted that in the facts upon which they based their complaint the named plaintiffs were not aggrieved by the acts of the appellees:

> Our Plaintiffs this morning, for example, are *not people, obviously, who are cowed and chilled;* they've come into Court, but they have to represent millions of Americans not nearly as forward, as courageous, as willing as them to open themselves up to public investigation and public scrutiny. We're not—you know, every citizen is not a Tom Payne; they're few and far between.

Tr. 17 (emphasis added).

This admission that the governmental activities they attack did not cause any substantial infringement of their constitutional rights constitutes a basic denial of practically their whole case. There still remains the allegation that the existence of the files and information operates to deny them their constitutional right of association with others who are chilled, but the chill to this amorphous group in turn is grounded in the unrealistic and speculative fear that the Government will improperly use the information against them.[1] The critical

---

24. *Cf.* Anderson v. Sills, 56 N.J. 210, 265 A.2d 678, 689 (1970), where the New Jersey Supreme Court reversed a lower court decision enjoining the statewide operation of a civil disorder intelligence system by the New Jersey State Police. The court there held that the operation of the intelligence system was at least partly pursuant to a valid governmental interest and should not have been enjoined by the trial court in a summary judgment proceeding. Rather, the court held that a full hearing should be conducted to determine whether the scope of the challenged intelligence system was overbroad in view of both the legitimate state interest in collecting information for planning for and preventing civil disorders and the possible burden on the exercise of First Amendment freedoms involved. With regard to its remand order, the court stated:

> In short, if it should be found that the police are gathering information which they could not reasonably believe to be relevant to the police function * * * and that circumstances warrant judicial intervention on that account, the injunctive order must be precisely limited to the offending material or practice. The order must not interfere with police activity that is proper, either in direct terms or because of the vagueness of the restraint.

A similar evaluation must be made in the instant case, with due account given to the differences in function and role between the police and the Army, in dealing with and seeking to prevent civil disorder, and relief, if any, should be appropriately tailored so as not to interfere with legitimate Army activity.

1. As the majority points out, appellants vigorously assert that they are not here attacking the legality of the many uses the Army might make of the information it is presently gathering; they are not basing their complaint on the possibility of future injury. Rather they assert that the present inhibitory effect of the Army's surveillance system is the only injury about which they complain; the nature of the sanctions which might be

information relates to reports of public activities of individuals who *publicly* participate in gatherings and demonstrations which tend to civil disorders and in related activities.[2] Appellees gathered this information from public sources and open meetings in much the same manner that newspapers cull information. However, there is one difference, *i. e.*, the newspapers publish much of the information they obtain, whereas the Army merely retains it for possible use by it in the future and this may not necessarily include any publication of the information. Such information is intended to be used to help suppress civil disorders in the event the military are called out in conformance with statute[3] for that purpose. Other obvious proper uses by the Army for such information may be judicially noticed from public incidents of the period and would include helping prevent and solve crimes involving destruction, threat of destruction, or

imposed on them at some future time is to them here irrelevant.

To my mind, this attempted distinction is untenable. Any present inhibition which they suffer must be based wholly on a fear, specific or general, of future consequences stemming from use of the Army's information. At the same time, they have alleged no present use, preparation for use or selectivity in gathering information by the Army which would reasonably justify such fears. This is not a situation comparable to the one facing the Court in Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), where, in order to receive certain mail, a person was required to tell the Government that he desired to receive "communist propaganda" or in Shelton v. Tucker, 364 U.S. 479, 486 & n. 7, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) where there was a realistic fear that information gathered from individuals would be misused. Any inhibition which appellants in this case suffer is attributable, not to what the Army is presently doing, but to their own imagination as to what it might do at some unknown time in the future. Therefore, it is inaccurate to contend that the Army's present surveillance activity is the source of the inhibitions which appellants allege. *Compare* Bee See Books, Inc. v. Leary, 291 F.Supp. 622 (S.D.N.Y.1968).

2. There are no allegations that the Army has conducted surveillance of wholly private activity and at oral argument appellants indicated, in effect, that they did not have any witnesses who would testify that the Army had engaged in such activity. *Compare* Local 309, United Furniture Workers of America v. Gates, 75 F.Supp. 620 (N.D.Ind.1948).

3. Statutory authority for the Army's activity in relation to civil disorders is contained in 10 U.S.C. §§ 331–33 (1964):

Whenever there is an insurrection in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States, in the number requested by that State, and use such of the armed forces, as he considers necessary to suppress the insurrection. 10 U.S.C. § 332.

Whenever the President considers that unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State or Territory by the ordinary course of judicial proceedings, he may call into Federal service such of the militia of any State, and use such of the armed forces, as he considers necessary to enforce those laws or to suppress the rebellion. 10 U.S.C. § 333.

The President, by using the militia or the armed forces, or both, or by any other means, shall take such measures as he considers necessary to suppress, in a State, any insurrection, domestic violence, unlawful combination, or conspiracy, if it—

(1) so hinders the execution of the laws of that State, and of the United States within the State, that any part or class of its people is deprived of a right, privilege, immunity, or protection named in the Constitution and secured by law, and the constituted authorities of that State are unable, fail, or refuse to protect that right, privilege, or immunity, or to give that protection; or

(2) opposes or obstructs the execution of the laws of the United States or impedes the course of justice under those laws.

In any situation covered by clause (1), the State shall be considered to have denied the equal protection of the laws secured by the Constitution. 10 U.S.C. § 333.

theft of military draft records, military supplies, military research and other Government property and facilities at draft centers, armories, military bases, forts, arsenals, military training centers and military suppliers and research centers operating under military contract.

In the instant complaint there are no allegations or claims that any of the information gathered by the Army has been used in a manner that has injured plaintiffs or imposed on them any penalty attributable to their exercise of their First Amendment rights. In fact, appellants acknowledge in their brief that the uses to which the collected information might be put by the Army are *unknown:*

> In the case at bar there is something more subtle at stake than the threat of prosecution and criminal sanctions present in *Dombrowski, supra.* There is a threat of *unknown* surveillance, *unknown* purpose, and *unknown* future use of the information gathered and recorded in connection with the defendants' civilian intelligence network. *This creates a substantial chilling effect upon the free and uninhibited exercise of First Amendment rights.*

(Emphasis added) (App. br. p. 40).
Such indefinite and abstract assertions of amorphous fears do not present a case involving facts of a concrete nature. Appellants' admission, *supra,* that the "threat" of which they complain is "unknown," as the latter word is used by appellants, means that the threat is

> "Not knowable * * * cannot be comprehended * * * beyond the limits of human experience, or of human powers of apprehension or understanding." Webster's International Dictionary (2d ed.)

Such indefinite claims of highly visionary apprehensions that are admittedly based in abstractions which cannot be comprehended, or are beyond human experience or understanding, do not present a case involving facts of sufficient realism and definiteness to confer jurisdiction on the court to make a sweeping constitutional decision affecting important activities of the federal Government. There is nothing more here than a highly abstract claim based on an imaginary fear that governmental power to collect information for a valid purpose will be misused for an *improper* purpose. Similar fears might exist with respect to any governmental power. All power is susceptible of misuse, but that truism when coupled with unfounded fear alone is not sufficient to make out a case for judicial jurisdiction. What is necessary before a court is authorized to assume jurisdiction is some allegation from which it can be concluded that the apprehension of the misuse of governmental power is a realistic possibility. Because of the absence of any such allegation here it is my view that a proper case or controversy does not exist. Davis v. Ichord, 143 U.S.App.D.C. ——, 442 F.2d 1207 (1970); Golden v. Zwickler, 394 U.S. 103, 108, 110, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

Since the claim of the named plaintiffs does not present a case or controversy, nothing is added by the fact that it has been framed as a class action. Davis v. Ichord, *supra,* at 1215 n. 19. *See generally* 2 Barron & Holtzoff, Federal Practice and Procedure § 567 at 308 (Wright rev. 1961); 3 J. Moore, Federal Practice ¶24.04 (1969). As Judge Johnsen remarked in Kansas City, Mo. v. Williams, 205 F.2d 47, 51 (8th Cir.), cert. denied, 346 U.S. 826, 74 S.Ct. 45, 98 L.Ed. 351 (1953):

> It is of course necessary generally that a plaintiff be able to show injury to himself in order to entitle him to seek judicial relief. He cannot be a mere volunteer and ask judicial intervention simply "because someone else may be hurt", but he "must present facts sufficient to show that his individual need requires the remedy for which he asks." McCabe v. Atchison, T. & S. F. Ry. Co., 235 U.S. 151, 162, 164, 35 S.Ct. 69, 71, 59 L.Ed. 169.

Moreover, even if I were to agree with the majority that appellants' claim was ripe, I would seriously question whether

the action was an appropriate class action. When one considers the great number of people that the named plaintiffs seek to represent, their highly varied backgrounds and activities, and that it is the constitutional right of the individual that is sought to be protected, it is obvious that a great many highly individualized questions would be presented. The record of each protestor, and each protest activity, might have to be considered separately and might necessarily result in different determinations as to whether the Army was justified in making a record of his public activities for possible future reference. Under such circumstances there is a serious question whether the complaint presents "questions of law or fact common to the class." Fed.R.Civ.P. 23(a) (2).[4] *See generally* Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied, Troster, Singer & Co. v. Green, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). The importance of this requirement is heightened by recognition of the vast numbers of people appellants seek to have rise *or fall* on the strength of the showing they make in this suit. *See* Fed.R.Civ.P. 23 (c) (3).

It should also be noted that it is Congress that is empowered by the Constitution "to make rules for the Government and regulation of the land and Naval forces" (U.S.Const. Art. I, § 8, cl. 14) and judicial notice may be taken that Congress is presently conducting public hearings upon the policy questions involved in this very area where the named plaintiffs here seek judicial intrusion.[5]

Finally, the trial court here concluded:

> The Court holds that what in effect the plaintiffs are complaining of here is that the Army is keeping the type of information that is available to all news media in this country, covered by all news media in this country, and which is in the morgues of the newspapers in this country and magazines,[6] and the Court holds that they state no

4. Fed.R.Civ.P. 23(a) provides:

> *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

5. 117 Cong.Rec.S. 985 (daily ed., February 8, 1971) reports the announcement by Senator Ervin that the Senate Judiciary Subcommittee on Constitutional Rights had scheduled hearings on Computers, Data Banks and the Bill of Rights. On September 8, 1970, Senator Ervin outlined the purpose and scope of the study. In this regard, it is well to note that the issues appellants seek to have litigated in this suit are tremendously complex, involving broad questions of both law and policy. Recognition of this complexity, recognition of the fact that courts generally become less and less able to deal competently with controversies the farther removed they are from the "impact of actuality" and rec-

ognition of the "legitimating function" of a judicial decree, *see* A. Bickel, The Least Dangerous Branch 30–31 (1962), all counsel against finding the present controversy ripe too early. In my view, resolution of the issues presented by appellants is much better undertaken, at this juncture, by the Congress than it is by this court.

6. There was a great deal of material in which the Army had an obviously legitimate interest stemming from the following factual situation, as outlined in the brief of appellee:

> [O]ur Nation, during the Summer of 1967, witnessed the tragic riots in Detroit and Newark and, for the first time in 25 years, the Army was called in to assist the local civilian authorities in quelling the Detroit disturbances. During the period 1967–68, the National Guard was called upon 83 times and the Army four times to quell cases of civil disorder. The March on the Pentagon, the disturbances at the Democratic Convention, and the rioting in the Nation's Capital, which left large areas of the City leveled, all required the use of the armed forces to bring order out of the chaos. It has been reported that during the month of April 1968 alone, there were 237 civil dis-

cause of action; they show no unconstitutional action on the part of the Army; they show no threats to their rights. And I will sustain the motion to dismiss and I will deny the preliminary injunction.  *  *  *

It is my view that we should affirm the action of the trial court and wait until a case appears involving some person who alleges a more tangible basis for the claimed threat to his rights. Certainly since these investigative activities began in 1965, if they were the great peril to the populace that appellants argue, there must be one individual who can be found to complain of an injury caused by a concrete threat of the *actual misuse* of such information. To the extent indicated above, I respectfully dissent.

orders, 27,000 arrests, 43 deaths, over 58 million dollars in property damages, and over 58,000 National Guard and Army troops had to be used 25 times to quell the civil disturbances.   U.S. News and World Report, September 2,

1968.  See also the Brandeis University Lemberg Center for Study of Violence Reports; Disorders—1968, by the General Adjustment Bureau, Inc.;   Riot and/or Civil Commotion Report by the American Insurance Association.