SOCIALIST WORKERS PARTY et al.,
Plaintiffs-Appellees,

v.

ATTORNEY GENERAL OF the UNITED STATES of America et al.,
Defendants-Appellants.

No. 638, Docket 74–2640.

United States Court of Appeals,
Second Circuit.

Argued Dec. 24, 1974.

Decided Dec. 24, 1974.

F.2d 540, 549 (CA5 1967), cert. denied, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968).

Steven J. Glassman, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., Southern District of New York, and John S. Siffert, Asst. U. S. Atty., of counsel), for defendants-appellants.

Herbert Jordan, New York City (Rabinowitz, Boudin & Standard, New York City, of counsel), for plaintiffs-appellees.

Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.

PER CURIAM:

In this action, filed in the District Court for the Southern District of New

See most recently In Re Dearborn Marine Service, Inc., 499 F.2d 287, in which we again refused to extend this concept.

York in July, 1973, the Socialist Workers Party (SWP), its youth-arm, Young Socialist Alliance (YSA), and several members sought wide ranging injunctive and monetary relief against a large number of Government officials with respect to alleged activities directed against the two organizations. Various pretrial steps had been taken, and trial early in 1975 appeared to be in prospect. On October 25, 1974, plaintiffs moved for what was styled a "preliminary" injunction restraining the Director of the Federal Bureau of Investigation (FBI) and his agents "from attending, surveilling, listening to, watching, or in any way monitoring the fourteenth National Convention of plaintiff Young Socialist Alliance to be held at the Jefferson Hotel in St. Louis, Missouri, from December 28, 1974, through January 1, 1975, and further restraining them from threatening any of the said acts and from causing or threatening to cause any of the said acts." After receiving affidavits and hearing counsel on three occasions, Judge Griesa, on December 13, 1974, rendered an extensive oral opinion and entered an order granting the injunction sought.[1] The defendants promptly appealed and moved for a stay[2] and for a preference or an expedited appeal, claiming *inter alia* that non-attendance by the informants would compromise their usefulness and even entail risk to their safety. On December 19 we set a briefing schedule which would bring the motions on for argument on December 24. Since decision on the motion for a stay would in effect determine the appeal and the briefs appeared to include all considerations relevant thereto, we later advised counsel that we would hear the appeal itself.

A few facts are undisputed: The convention is open for attendance by any person under the age of 29. This is true even of "delegated" sessions where only elected delegates may speak and vote but all registrants are welcome as observers. Persons attending the meeting

wear identification badges. There is to be no electronic surveillance. Although at one time the FBI had developed a program to engage in disruptive activities at SWP and YSA conventions, this was formally discontinued in April 1971, and there is nothing to show it has been renewed. While the district judge and the plaintiffs make some general references to "surveillance", the Government has represented that at the 1974 convention there will be none in the ordinary sense and that the investigating method will be the use of informants who will attend the meetings as any member of the public, including the press, has been allowed to do. Despite some contrary allegations by the plaintiffs, there is no evidence that the FBI sends the names of persons attending the conventions outside the Federal Government; it does send them to the Civil Service Commission which has made use of them as a basis for questioning those who are Government employees or seek Government employment.

Although not disputing that at one time the SWP aimed at the overthrow of the government of the United States by force and violence, plaintiffs assert and the district court found that this policy had long since been formally abandoned. The Government contends, however, that, despite official disapproval, a minority in the SWP, called the Internationalist Tendency (IT), endorses and supports the current use of violence in line with the views of the International Majority Tendency of the Fourth International, a Trotskyist-communist organization headquartered in Europe with which SWP, although claiming not to be affiliated, concedes it has "a sympathetic, fraternal relationship". The FBI has also come upon information indicating that the IT regards as its "most important priority" an "interventionist" role in the YSA which will lead that organization to adopt the revolutionary aims of the IT.[3]

1. The order specifically included confidential informants.

2. Judge Griesa had denied a stay.

3. Some of these details are contained in reply affidavits submitted on the motion for a stay. Plaintiffs have moved to strike these, and particularly to strike an affidavit with respect to

At first blush there would hardly seem to be a role less appropriate for or capable of effective performance by the federal judiciary than advance supervision of the investigative methods of the FBI on a case-by-case basis, particularly in the field of national security. Recent instances where national security has been inappropriately invoked should not obscure that, as the Supreme Court has observed, "unless Government safeguards its own capacity to function and to preserve the security of its people, society itself could become so disordered that all rights and liberties would be endangered," United States v. United States District Court, 407 U.S. 297, 312, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972), where the Court also quoted from Chief Justice Hughes' opinion in Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941).[4] The Government distinguishes the Supreme Court decisions mainly relied on by plaintiffs, notably NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Bates v. Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); Gibson v. Florida Legislative Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963), and DeGregory v. New Hampshire, 383 U.S. 825, 829, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966), on the ground that these did not involve the judiciary in exercising prior restraints on an investigative agency in the executive or legislative branch but

rather represented a refusal to permit legal processes to be used against individuals or associations in a manner violative of First Amendment rights. Indeed, it claims that the injunction here issued flies in the face of the holding in Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), that a complaint seeking to enjoin the Army's data-gathering system with respect to lawful civilian political activity did not present a justiciable controversy. It relies particularly on the statement, 408 U.S. at 15, 92 S.Ct. at 2326:

> Carried to its logical end, this approach [of the Court of Appeals for the District of Columbia Circuit, 144 U.S.App.D.C. 72, 444 F.2d 947, 958] would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the "power of the purse"; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action.

The district judge and the appellees say that this case comes within the qualification at the end of this wise observation of the Chief Justice. Although a number of reasons are asserted, two appear to be most important. The one principally relied on by the district judge was that plaintiffs in Laird v. Tatum had showed only a "subjective chill"

---

the nature of the informants which was submitted *in camera* in line with an offer of proof made by the defendants to the district judge in an unsuccessful effort to obtain a modification of the injunction which would allow the informants to attend on condition that they not report to the FBI. These affidavits flesh out material already in the record; the need for this has arisen in part from the fact that the district judge proceeded on the basis of affidavits, rather than heeding our views that, except in cases of urgency, disputed issues of fact relevant to the issuance of temporary injunctions should not be so determined. SEC v. Frank, 388 F.2d 486, 490–493 (2 Cir. 1968). In part the need arose from extra-record references in appellee's memorandum in opposition to the motion for a stay. For example, when appellees say in

opposing a stay, "There is not a shred of evidence that this policy [of disruption] has ever been repudiated or withdrawn as a key factor in FBI decisions or operations concerning plaintiffs", it was appropriate for the defendants to submit an affidavit that there is also not a "shred of evidence" that the policy has continued. Technically the affidavits are properly before us only on the motion for a stay; although the issues on this and the appeal are almost inextricable, we have considered them only in that context.

4. "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses."

whereas the plaintiffs here had submitted affidavits asserting that attendance at YSA conventions had in fact been discouraged by knowledge of FBI surveillance plans. The other is the lack of as much justification for the FBI's surveillance as was thought to exist for the Army's plan to inform itself with respect to dissident student organizations so as to be better able to cope with disorders if required to do this on short notice.

We are not greatly persuaded with respect to the validity of these or other asserted distinctions, on the facts presently before us. Save possibly for the communication of names to the Civil Service Commission, the FBI's use of the information gathered by it from attendance at the YSA conventions seems parallel to that of the Army as described in Mr. Justice Douglas' dissent in Laird v. Tatum, 408 U.S. at 24–25, 92 S.Ct. 2318. Moreover, the Court of Appeals in that case had characterized the plaintiffs' claim as being that the Army surveillance "exercises a *present inhibiting effect* on their full expression and utilization of their First Amendment rights . . . .", 444 F.2d at 954 (emphasis in original), and it is hard to see why the attendance of FBI informants at YSA conventions should have more of an inhibiting effect than the Army's surveillance of student organizations. With respect to the second ground, the bite of the decision in Laird v. Tatum was that, absent a stronger showing of "chill" than was made by the plaintiffs there, the courts were not to go into this. If the issue is open for inquiry, while the possibilities of the dissident wing in SWP being able to gain control and effectuate its desires to convert YSA into a violent movement may be less than the risks of serious student disorders in the late 1960's, the stakes are greater. The FBI has a right, indeed a duty, to keep itself informed with respect to the possible commission of crimes; it is not obliged to wear blinders until it may be too late for prevention. As Judge Weinfeld observed in Handschu v. Special

Services Division, 349 F.Supp. 766, 769 (S.D.N.Y.1972):

> The use of informers and infiltrators by itself does not give rise to any claim of violation of constitutional rights.

Although plaintiffs apparently concede that use of informants need not await the existence of probable cause for arrest, we have not been informed either by them or by the district judge what they think the proper standard to be. Moreover, while plaintiffs' case here may be better than Tatum's in some respects, it is weaker in another. A major basis for the attack there, certainly the most significant factor for the dissenters, was that investigation had been conducted by the Army as distinguished from a civilian investigative agency.

The underlying action here raises the issue so eloquently described by Mr. Justice Jackson nearly twenty-five years ago:

> The Court's day-to-day task is to reject as false, claims in the name of civil liberty which, if granted, would paralyze or impair authority to defend existence of our society, and to reject as false, claims in the name of security which would undermine our freedoms and open the way to oppression.

American Communications Ass'n v. Douds, 339 U.S. 382, 445, 70 S.Ct. 674, 707, 94 L.Ed. 925 (1950) (concurring and dissenting). It does this in the special context of whether the conduct sought to be protected is a legitimate area for investigation. Such an issue deserves treatment on a full record and with ample time for reflection, initially by the district judge, later by this court, and perhaps ultimately by higher authority. There was no urgency requiring the district judge to decide issues of such gravity by granting an injunction against the FBI's continuing, for one more YSA convention, the practices it had followed for many years, apparently without serious injury to the plaintiffs, and confronting us with the need of acting within a few days, in the midst of a crowded calendar,

on a problem deserving weeks of consideration and opinion writing on a proper record. The plaintiffs made no showing sufficient to justify issuance of an injunction on the basis of conflicting affidavits, see note 3, and reliance on what they term "informed representations of counsel" with respect to the involved relationships of SWA, its members, and other organizations. Plans for attending the convention on December 28 must largely have been made, or not made, well before the injunction was issued on December 13. The only benefits to plaintiffs in relieving the "chill" allegedly created by the FBI were the possibility that the injunction, if sufficiently publicized, might lead some with souls less courageous than those of the individual plaintiffs, see 408 U.S. at 7–8 n. 7, 92 S.Ct. 2318, to decide to attend after all, and to encourage greater freedom by participants in advocating the revolutionary tactics which the plaintiffs claim to abhor. Even on this the benefit is simply the incremental difference between fear of revelation by prearranged informants and of voluntary reports by others who are free to attend these public meetings; no one has yet suggested that the FBI be restrained from receiving information freely reported to it. Against this is the serious prejudice to the Government from compromising some or all the informants for all time, even though the final determination of the action may be for the defendants. Whatever may be the ultimate merits of plaintiffs' case, there was no occasion for a rush to judgment with respect to the Fourteenth YSA convention when the proof was that the FBI was proposing to do only what—indeed apparently less than—it had done without serious adverse effect before. We hold therefore that issuance of the broad injunction on this inadequate record was an abuse of discretion.

One respect in which the balance may tip in favor of the plaintiffs is the FBI's practice of transmitting to the Civil Service Commission the names of persons attending the convention. Apparently defendants concede that such attendance would not justify dismissal from or denial of employment. See Gordon v. Blount, 336 F.Supp. 1271 (D.D.C. 1971). This is the point most stressed by the plaintiffs in seeking to show "objective chill", and we think the values of preserving freedom of association justify enjoining such transmission pending final determination of the action or earlier order of the district court or this court. We shall hold the Government to its representation that no transmission is made outside the Federal Government.

With this exception, the injunction is vacated. The various motions are thus rendered moot. The mandate will issue forthwith. No costs.