[Crim. No. 7591. Fourth Dist., Div. Two. Aug. 27, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
KAREN HOPE ELDER et al., Defendants and Appellants.

## COUNSEL

David H. Brickner and Marvin D. Mayer, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, M. Howard Wayne and Steven H. Zeigen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**—Defendant Elder was found guilty by a jury of 1 count of conspiracy to commit bookmaking (Pen. Code, § 182, subd. 1) and 29 counts of violation of Penal Code section 337a (bookmaking). Defendant Hatrick was found guilty of 1 count of conspiracy to commit bookmaking (Pen. Code, § 182, subd. 1) and 27 counts of violation of Penal Code section 337a (bookmaking).

Both defendants were granted probation.[1]

### FACTS

Ronald Mitre, an undercover operative in a bookmaking investigation by the Orange County District Attorney's Organized Crime Unit, on June 11, 1974, contacted George Brazer at the Blue and White Cab Company and indicated he was interested in becoming associated with Brazer's bookmaking operation. Brazer indicated that Mitre would be contacted by a person named Al. Contact was made between Al and Mitre later that day, Mitre identifying himself as Ron Barnett. A meeting was arranged for the Marquis Lounge in Anaheim.

---

[1]The appeal of defendant George Brazer was dismissed by order of this court on March 8, 1976. Al Hickin, charged with defendants, is not involved herein.

Mitre, wearing a recording device, met as scheduled with Al Hickin. Hickin gave Mitre a piece of paper containing the name Sam, a phone number, and the notation Ron 29. Mitre apparently called the phone number given him by Hickin and asked for Sam. A female voice responded. Similar calls were made for the following four days from a telephone in the Organized Crime Unit and on each occasion bets were placed.

On June 17, 1974, Mitre met with Brazer, Hickin, and defendant Hatrick at the Saddleback Inn. The conversation included the method used to determine how much money was won or lost by individual bettors. Brazer indicated Hickin would meet with Mitre on the following day to discuss collection problems. After giving Brazer $26 for bets he had lost, Mitre left the inn.

On the following day, June 18, Hickin and Mitre met at a Texaco station. Hickin indicated there were problems collecting bets from Dave Klein who owed them approximately $1,000 and Ernie who was approximately $1,500 in arrears. Hickin also indicated that he and Brazer were partners in the operation. Mitre's percentage for collecting these delinquent bets was to be one-quarter.

On the following three days, June 19, 20 and 21, Mitre again called the telephone number originally given him by Hickin and placed bets with Sam.

Another meeting with Brazer at the Saddleback Inn occurred on June 24, 1974. Mondays had previously been arranged as pay-off days. After discussing how much he owed Brazer, Mitre gave him $35. Brazer also informed Mitre that defendant Hatrick was making the collections that day since Hickin was in the hospital.

On June 24 defendant Hatrick was seen entering a residence at 12341 Harvey Way in Garden Grove. Later that same day, defendant Hatrick met with Brazer at the Elbow Room Bar in Santa Ana.

On June 26 Mitre again placed bets over the phone with Sam. Following this call, he telephoned defendant Hatrick at the Blue and White Cab Company. Three similar calls to Sam were placed on June 27, 1974. Mitre placed many bets that day in the hope of losing money and effecting an arrest of Brazer during the purported payoff. Instead, he

won $220. The last two contacts between Mitre and the bookmaking operation were on June 28, 1974. First, Mitre called the Blue and White Cab Company and spoke with George Brazer. Next, in the presence of district attorney investigator Don Carroll, Mitre called Sam's number and began placing bets. While this call was being placed, investigator Marwin was outside 12341 Harvey Way, the residence where the phone was located. When Mitre began placing his bets, Carroll so informed Marwin, who in turn proceeded to the residence to execute a search warrant in his possession.

After receiving Carroll's message, Marwin went to the front door of the residence, knocked loudly and said, "Police officers, open up, you are under arrest for bookmaking." Marwin, receiving no acknowledgement for approximately 20 seconds after knocking, then opened the door and entered the residence. Defendant Elder was seen eight to ten feet from the door, walking in its direction. Going to the kitchen, Marwin saw the telephone off the hook, picked it up and heard Mitre's voice on the other end.

Searching the residence pursuant to the search warrant, numerous pieces of betting paraphernalia were confiscated.

Three other search warrants issued the same day for two residences and a business all produced evidence of betting. When Brazer was informed by one of the investigators he was under arrest for bookmaking, he said to Mitre, who had accompanied the officers in executing the warrant on the Blue and White Cab Company office, "I knew you were a cop, I told you so." Defendant Elder was also an employee of the Blue and White Cab Company, and had used the nickname Sam.

## DISCUSSION

### Karen Elder's Contentions

### I

### Telephone and Gas Company Records

Defendant Elder claims her constitutional right to privacy was violated by a warrantless search and seizure of records of Pacific Telephone

Company and Southern California Gas Company.[2] Law enforcement, as previously indicated, had a telephone number through which bets were placed. The district attorney investigator obtained from the telephone company the name and address of the subscriber to that number, to wit: Tamara Ballein, 12341 Harvey Lane, Garden Grove.[3]

The address was then submitted to the gas company which disclosed the subscriber to be a Robert E. Cooper. Cooper's employment at the Tustin Cab Company tied him to Brazer, who was working out of that same location. The district attorney's family support records were then checked under Cooper's name and they disclosed an action previously brought against him by Elder as complaining witness. The name of defendant Elder's daughter was listed as Tamara Ballein.

Defendant relies on *Burrows* v. *Superior Court,* 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590], in which it was held that a warrantless search of bank records was a violation of the constitutional right to privacy. Additional reliance is placed on *People* v. *McKunes,* 51 Cal.App.3d 487 [124 Cal.Rptr. 126], in which the *Burrows'* lead was followed in holding the police seizure of records of telephone calls was an unconstitutional invasion of privacy.

It is said in *Burrows* that "the appropriate test is whether a person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion." (At p. 243.) In both *Burrows* and *McKunes* the material seized disclosed personal affairs of the defendants. Here, unlike both *Burrows* and *McKunes,* there was no seizure of the "current biography" of the affairs of defendant (or Ballein or Cooper). Defendant seeks to carry the concept of *Burrows* and *McKunes* too far.

Name and address relate to identification rather than disclosure of private, personal affairs. It is virtually impossible to live in our current society without repeated disclosure of name and address, both privately and to the government. While a myriad of reasons motivate some to

---

[2]Defendant was not the telephone or gas subscriber and thus disclosure of third party subscriber names suggest vicarious rather than personal privacy rights at issue. The gas was in the name of her former "common law" husband although he knew nothing of it or it was in the name of their two- or three-year old son who has the same name as the father. The telephone was in the name of defendant's 12- or 13-year-old daughter.

[3]"Credit information" was also given by the telephone company. Whatever the substance of it was, it was not relevant to the sequences under challenge.

reduce the degree of their identity before the public eye which includes, for example, subscribing to an unlisted telephone number, this quest for anonymity does not compel the conclusion that a reasonable expectation of privacy existed on the facts before us.

■ We think the answer to the contention raised is simply this: There is no reasonable expectation of privacy in name, address, or telephone number as found in the records of the telephone company nor any reasonable expectation of privacy in the address of the subscriber of gas company services from disclosure to law enforcement, without the benefit of a warrant, as a part of its normal and legitimate investigative procedures. We think it unreasonable to conclude that the information of identity here obtained would be reasonably contemplated by the subscriber to be within the constitutional privacy protection. If the police go further, as demonstrated by *Burrows* and *McKunes,* the nature of the information obtained changes the result.

II

*Penal Code Section 1531 Compliance*

A search warrant was obtained for the residence at 12341 Harvey Lane. The plan in executing the warrant was that a call would be made placing a bet. Investigator Marwin was to be given notice one minute before the call and then notified again when the bet taking was in progress. At that point Marwin was to effect the arrest of the person taking the bet on the telephone and serve the search warrant.

When Marwin was advised that bets were then being accepted, he went to the front door, knocked, and "stated loudly 'Police officers. Open up. You are under arrest for bookmaking.'" After waiting approximately 20 seconds and hearing nothing, he entered through the unlocked but closed door. Marwin, among other things, believed it was necessary to get to the telephone as quickly as possible. Apparently the connection on an incoming call can be preserved for a matter of some 15 seconds after the receiving telephone is recradled and Marwin knew this.

There is some suggestion in defendant's argument on appeal that she is contending that there was no demand for admittance. ■ We think this contention is meritless in light of the officer's demand to "open up."

The thrust of defendant's contention is that there was no refused admittance and thus no legally cognizable justification for the entry at the time it was made. ■ An unreasonable delay in responding to the officer constitutes refused admittance. (*People* v. *Peterson,* 9 Cal.3d 717, 723 [108 Cal.Rptr. 835, 511 P.2d 1187].) Marwin waited 20 seconds before entering because he was attempting to comply with the law and apparently it was either his general rule, or the general rule of his department, to wait 20 seconds to allow time to respond to a knock on a door.

Twenty seconds would clearly be too short a wait for a door-to-door salesman or at a house of gargantuan proportions or during a time normally associated with sleeping, but here we are dealing with a knock on the door during the early afternoon of a Friday. Marwin knew someone was in the house. Twenty seconds is not a flash of time allowing for no response at all. If an acknowledging voice from within had responded, 20 seconds may have been too short a time to wait. There was no such response. While in some cases there are noises heard within the residence which gives a clue as to whether a response is to be forthcoming, here there was no sound of a wild rampage of bull elephants toward windows and back doors while the staccato of flushing toilets interlaced the frenzy. Instead there was just silence.

Silence for 20 seconds where it is known that someone is within the residence suggests that no one intends to answer the door. Twenty seconds of silence may be sufficient in one case and insufficient in another. Other than the question of waiting only 20 seconds, there was full compliance with section 1531. It is our conclusion that under the circumstances of this case, silence for 20 seconds reasonably allowed the officer to conclude that his demand for admittance was being declined. This is particularly true in light of the fact the officer knew at that time that a crime was being perpetrated inside the residence.

■ As an alternative ground for affirmance, it appears that there is sufficient information in this record to conclude that the officer substantially complied with section 1531 when he entered to prevent destruction of evidence, i.e., preservation of the telephone connection through which a bet was being placed.

Under either view, we conclude that the entry was in compliance with section 1531.

*Kathie Hatrick's Contentions*

### III

*Sufficiency of the Evidence*

Defendant Hatrick contends that it was error to deny her acquittal motion pursuant to Penal Code section 1118.1 in that the evidence failed to demonstrate the dual specific intent requirements of intent to conspire and intent to commit the underlying offense constituting the conspiracy's object. (See: *People* v. *Horn,* 12 Cal.3d 290 [115 Cal.Rptr. 516, 524 P.2d 1300].) She sees the evidence as establishing no more than a mere association with the conspirators, innocent conversations about horse racing, a meaningless trip to an involved house and an unknowing collection of a gambling debt. The contention is wishful thinking, the test being that of substantial evidence. (*People* v. *Wong,* 35 Cal.App.3d 812, 828 [111 Cal.Rptr. 314].)

On June 17, 1974, Mitre met with Brazer, Hickin and defendant Hatrick and a conversation occurred which involved the method used to determine the amount of money won and lost by bettors. At that meeting defendant suggested that Brazer and Hickin discuss a collection problem involving "Dave and Ray."

Robert Schaefer, who regularly bet through Hickin, on more than one occasion collected his winnings from or paid his losses to defendant. On one occasion Schaefer asked defendant why Hickin was not collecting. Defendant responded that he had been injured.

Bettor LaVerne Krieger testified that he had placed telephone bets with both "Sam" and "Kathie."

While defendant was under surveillance, on June 24, 1974, she was seen visiting 12341 Harvey Way while carrying what appeared to be a notebook. She also visited 18805 Barry Lane in Tustin, another residence in which betting paraphernalia was located pursuant to search warrant. Then, that evening she met and conversed with Brazer at the Elbow Room Bar in Santa Ana.

■ The above evidence sufficiently establishes specific intent within the meaning of *People* v. *Horn, supra.* There is substantial evidence of both her specific intent to conspire, and her specific intent to commit the intended bookmaking violations.

## IV

### *The Tape Transcript*

The conversation between Brazer, Hickin, defendant Hatrick and Mitre in the Saddleback Inn on June 17, 1974, was taped. A typed transcript of the tape was admitted into evidence but the court declined to allow the tape itself to be played before the jury. Defendant contends that under the circumstances the tape transcript was inadmissible hearsay. The People's response to this argument is somewhat confusing.

■ The simple answer is that, even if the transcript was admitted erroneously, the error in doing so was harmless under the *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243], test. Apparently the tape was partially or substantially inaudible, resulting in asterisks on the transcript. Given error in admission of the transcript, if it had not been admitted there is no reasonable likelihood that a different result would have occurred in this case. The evidence, as related in section III of this opinion, clearly demonstrates the defendant's guilt.

The judgment as to both Elder and Hatrick is affirmed.