[S.F. No. 24708. July 24, 1986.]

CHRISTOPHER ANN PERKEY, Plaintiff and Appellant, v.
DEPARTMENT OF MOTOR VEHICLES et al.,
Defendants and Respondents.

**COUNSEL**

Brent A. Barnhart for Plaintiff and Appellant.

Fred Okrand and Robert Burns as Amici Curiae on behalf of Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, and Faith J. Geoghegan, Deputy Attorney General, for Defendants and Respondents.

**OPINION**

**BIRD, C. J.**—May the state compel an individual to provide a fingerprint as a condition for obtaining a driver's license, where the fingerprint is to be disseminated to third parties for purposes unrelated to motor vehicle safety?

## I.

Vehicle Code section 12800, subdivision (c) requires each applicant for a driver's license to submit a fingerprint to the Department of Motor Vehicles (hereafter DMV or department).[1] In enacting this provision, the Legislature stressed the importance of such a requirement to maintaining a reliable

---

[1]Section 12800 provides in relevant part that "Every application for a driver's license shall contain all of the following information: . . . [¶] (c) A legible print of the thumb or finger of the applicant."

licensing system: "The state has adopted a policy that the driver's license and identification card issued by the Department of Motor Vehicles are the basic identification documents in this state and that the state has a compelling interest in insuring the accuracy and integrity of this identification system. It is the purpose and intent of this act to further secure the accuracy and integrity of this system by requiring the application for a license or card to include a legible thumb or fingerprint of the applicant, effective July 1, 1982." (Stats. 1981, ch. 1102, § 3, pp. 4311-4312.)

The declarations[2] reveal that the DMV indiscriminately discloses the fingerprints obtained from license applicants to the general public. There are numerous admissions in the record of instances in which the DMV has sold its computerized fingerprint file—or access to it—to anyone who can afford to pay the fee.[3]

In August of 1982, plaintiff (hereafter petitioner) Christopher Ann Perkey applied for a renewal of her driver's license. She filled out the renewal form, paid the application fee, passed the eye test and the written examination, but refused to be fingerprinted. The DMV denied her application for renewal.

The denial was based solely on petitioner's refusal to be fingerprinted. The department concedes that petitioner has otherwise satisfied all requirements for renewal. While the department has the discretion to issue a license to an applicant who has not complied with Vehicle Code section 12800, subdivision (c) (Veh. Code, § 12809, subd. (b)), the declarations establish that it is the department's policy to deny a license to *any* applicant who refuses to be fingerprinted.

Petitioner has never been fingerprinted by a government agency. She was first licensed to drive in New Jersey in 1959. She later obtained driver's licenses in Indiana and Wisconsin. She has also held licenses to teach public school in each of those states. However, none of the agencies involved conditioned the issuance of a license on her submission of a fingerprint.

---

[2]The evidence presented to the trial court consists of sworn declarations submitted by petitioner and by various officials of the department and other state agencies. The parties stipulated that the trial court could consider these declarations as evidence.

[3]For example, the DMV's fingerprint files are open to use by sophisticated private investigation services. The use of such investigators by nuclear power companies to conduct extensive surveillance and intelligence activities against opponents of nuclear power in an effort to chill and repress the expression of antinuclear views has been documented. (See Kairys & Shapiro, *Remedies for Private Intelligence Abuses: Legal and Ideological Barriers* (1980-1981) 10 N.Y.U. Rev. L. & Soc. Change 233; Peterzell, Nuclear Power and Political Surveillance (1981); Kairys, *Civil Liberties and the Fight over Nuclear Power* (Dec. 17, 1979) National L.J. p. 19, col. 1; Warnock, Nuclear Power and Civil Liberties, Can We Have Both? (1979).)

Petitioner was first licensed to drive in California in 1975. At that time, the submission of a fingerprint on the driver's license application was optional, and petitioner elected not to be fingerprinted.

Petitioner concedes that the DMV could properly collect fingerprints solely for its own use in detecting and preventing fraudulent license applications. However, she contends that the collection and retention of fingerprints for unrestricted use in a statewide identification system violates the right of personal privacy guaranteed by the California Constitution. (Cal. Const., art. I, § 1.) Specifically, she argues that Vehicle Code section 12800, subdivision (c), by requiring the submission of a fingerprint for use in such a system impermissibly conditions access to a public benefit on the waiver of a constitutional right.

Petitioner sought a writ of mandate to compel the DMV to renew her driver's license without requiring a fingerprint. In the alternative, she requested a declaration that the fingerprint requirement is unconstitutional. The trial court denied the requested relief. It is from that judgment that petitioner appeals.

## II.

Petitioner urges this court to strike down the mandatory fingerprint requirement as a violation of substantive due process. Although petitioner acknowledges that the state has the power to regulate the right to drive, she maintains that Vehicle Code section 12800, subdivision (c) is unconstitutional because a proper nexus has not been established between the fingerprint requirement and the state's interest in promoting highway safety.

When called upon to evaluate a substantive due process challenge to a legislative police power measure that does not impinge upon fundamental rights, constitutional principles require the reviewing court to apply the rational basis test. (See *People* v. *Glaze* (1980) 27 Cal.3d 841, 845-846 [166 Cal.Rptr. 859, 614 P.2d 291].) The right to drive is not a fundamental right under the California Constitution. (*Hernandez* v. *Department of Motor Vehicles* (1981) 30 Cal.3d 70, 80 [177 Cal.Rptr. 566, 634 P.2d 917].) Accordingly, the standard to be applied in determining whether the challenged provision comports with the requirements of due process is that enunciated in *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 484 P.2d 512]: "In the exercise of its police power a Legislature does not violate due process so long as an enactment is procedurally fair and reasonably related to a proper legislative goal."[4]

---

[4]Petitioner appears to have abandoned her contention that under the California Constitution the right to drive is a fundamental right that the state may regulate only for a compelling purpose.

The Legislature adopted Vehicle Code section 12800, subdivision (c) to ensure the accuracy of the department's drivers' license records. (See Stats. 1981, ch. 1102, § 3, pp. 4311-4312.) As the declarations in this case demonstrate, the department faces many difficulties in its efforts to verify the personal identification information contained in the licensing system. In past years, the incidence of fraud and duplicate licensing has been steadily increasing, while the successful detection of such illegality has been declining. From September of 1981 to September of 1982, the last year that fingerprints were still optional, 1,858 incidents of suspected fraud were encountered by the department. Furthermore, a department study conducted in 1980 indicated that approximately 186,000 more driver's licenses had been issued to males between the ages of 20 and 44 than there were eligible persons in this category.

The significance of these fraudulently obtained licenses becomes evident when one considers the multitude of cases in which the department denies, suspends, or terminates the driving privileges of persons who are dangerous drivers. (Veh. Code, § 13352.) It is not uncommon for a person whose license has been revoked pursuant to a conviction for reckless driving or driving under the influence of drugs or alcohol to apply for a new license using false identification. To the extent that the fingerprint requirement will deter this type of fraud there can be little doubt that it will operate to promote highway safety.

Thus, the interception of applications from those who pose a serious danger to public safety clearly constitutes a proper legislative objective. The question remaining is whether the statutory provision requiring fingerprints is reasonably related to that objective.

The department asserts that the utilization of fingerprint technology is the only reliable means of ensuring the integrity of its records. The handwriting specimen furnished by the applicant is too small and too easily simulated to provide a verifiable exemplar. Similarly, the photograph appearing on the license does not provide an accurate means of detecting fraudulent applications since an applicant can easily alter his or her appearance with wigs, makeup, or a change in facial hair. The only assuredly accurate source of identification which remains immutable throughout an individual's lifetime is his or her fingerprints. Thus, the statutory provision requiring the submission of a fingerprint as a part of the license application process bears a reasonable and rational relationship to the goal of promoting the safe and lawful use of California highways.

Petitioner's next contention is that the mandatory fingerprint requirement violates her right to privacy. Preliminarily, this court must examine

the procedure itself to determine whether it involves the kind of intrusive invasion of bodily integrity that has been found either to violate "due process" rights guaranteed by the Fifth and Fourteenth Amendments (*Rochin v. California* (1952) 342 U.S. 165, 172-174 [96 L.Ed. 183, 190-191, 72 S.Ct. 205, 25 A.L.R.2d 1396]) or to contravene the Fourth Amendment's proscription against "unreasonable" searches (*Schmerber v. California* (1966) 384 U.S. 757, 766-772 [16 L.Ed.2d 908, 917-920, 86 S.Ct. 1826]).

The decisional authority in this area demonstrates that fingerprinting alone does not improperly infringe upon an individual's right of privacy. (See *United States v. Sechrist* (7th Cir. 1981) 640 F.2d 81, 86.) In *Davis v. Mississippi* (1969) 394 U.S. 721 [22 L.Ed.2d 676, 89 S.Ct. 1394], the United States Supreme Court indicated that fingerprinting may not implicate the Fourth Amendment since it "involves none of the probing into an individual's private life and thoughts that marks an interrogation or search." (*Id.*, at p. 727 [22 L.Ed.2d at p. 681]; *United States v. Dionisio* (1973) 410 U.S. 1, 15 [35 L.Ed.2d 67, 80, 93 S.Ct. 764].) Unlike forcible stomach pumping (see *Rochin v. California, supra,* 342 U.S. 165) or the involuntary obtaining of a semen sample (*People v. Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123]), the physical process by which fingerprints are taken does not require "penetration[] beyond the body's surface." Therefore, it does not readily offend those principles of dignity and privacy which are fundamental to our notion of due process. (See *Rochin v. California, supra,* 342 U.S. at p. 172 [96 L.Ed. at p. 190].) In light of the unobtrusive nature of the fingerprinting process, the courts in this state have permitted the use of fingerprinting in many noncriminal contexts. (See, e.g., *Miller v. Murphy* (1983) 143 Cal.App.3d 337, 344-346 [191 Cal.Rptr. 740] [municipal ordinance requiring customers of pawnbrokers to be fingerprinted upheld]; *People v. Stuller* (1970) 10 Cal.App.3d 582, 593-597 [89 Cal.Rptr. 158, 41 A.L.R.3d 712] [ordinance requiring bartenders to submit fingerprints to the local police department upheld].)

Petitioner also alleges that the collection and dissemination of fingerprints for identification use by various governmental agencies or private entities violates her right of privacy as protected by article I, section 1 of the California Constitution. ■ As this court will conclude, the DMV's dissemination of fingerprint data to third parties for purposes unrelated to motor vehicle safety is unlawful under several provisions of the Civil and Vehicle Codes. Therefore, the court need not reach the related question of whether petitioner's privacy rights are violated by dissemination of such data.

In 1972, the people of California amended the state Constitution to provide explicit language protecting the personal right of privacy.[5] Five years

---

[5]Article I, section 1 (as amended in Nov. of 1974) now reads: "All people are by nature

later, the Legislature enacted the Information Practices Act of 1977 (the Act). (Civ. Code, § 1798 et seq.)[6] The Act delineates an elaborate statutory scheme specifically designed to implement the privacy amendment.

Section 1798.1, one of the Act's introductory provisions, captures the spirit of the legislation: "The Legislature declares that the right to privacy is a personal and fundamental right protected by Section 1 of Article I of the Constitution of California and by the United States Constitution and that all individuals have a right of privacy in information pertaining to them."

In the Act's declaration of purpose, the Legislature stated that the right to privacy was being threatened by "the indiscriminate collection, maintenance, and dissemination of personal information and the lack of effective laws and legal remedies" and that "[t]he increasing use of computers and other sophisticated information technology has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information." (§ 1798.1, subds. (a) and (b).)

To guard against this threat, the Act places strict limits on "the maintenance and dissemination of personal information." (*Id.*, subd. (c).) "Personal information" is defined to include "any information *that is maintained by an agency that identifies or describes an individual,* including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history. It includes statements made by, or attributed to, the individual."[7] (§ 1798.3, subd. (a), italics added.)

---

free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

[6] All subsequent statutory references are to the Civil Code unless otherwise indicated.

[7] The Act was amended in 1985. (Stats. 1985, ch. 595.) For purposes of awarding declaratory relief, this court has utilized the amended Act.

The principal effect of the amendments was to eliminate the terms "confidential information" and "nonpersonal information" from the Act. The term "confidential information" defined information which, for specified purposes, could be withheld from the persons to whom it pertained. (See former § 1798.3.) Section 1798.40 of the amended Act now fulfills this function. The term "nonpersonal information" designated information which was not deemed to warrant coverage by the Act. (See former § 1798.3.)

In addition to these changes, the provision defining "personal information" was amended. The previous provision defined "personal information" as "any information in any record about an individual that is maintained by an agency, including, but not limited to, his or her education, financial transactions, medical, or employment history." (See former § 1798.3, subd. (b).) The recent amendment added the language "information . . . that identifies or describes an individual." (§ 1798.3, subd. (a).) The DMV's fingerprint files must be deemed "personal information" within the meaning of either provision. Therefore, the analysis in this opinion is applicable to those individuals whose fingerprints were disseminated by the DMV while the unamended Act was in force.

Under the Act, state agencies are required to limit the collection and retention of personal information to that necessary to accomplish the agency's specific purpose (§ 1798.14). If an agency maintains such a record (§ 1798.32), individuals must be informed when they request it. Further, they may request amendments to correct any inaccurate information (§§ 1798.35-1798.37). More importantly, all disclosures of personal information are restricted (§ 1798.24), and an accounting of such disclosures must be made, including disclosures pursuant to subpoena or search warrant (§ 1798.25).

Although fingerprints, as such, are not specifically listed in the definition of "personal information," there can be no doubt that the Act was intended to provide protection for precisely this type of record. Fingerprints fall within the category of information "that identifies or describes an individual." (§ 1798.3.) Moreover, a fingerprint is a much more private matter than a name or address and its disclosure can lead to much greater intrusions on privacy than the simple disclosure of an individual's name.

The record in this case contains admissions of unrestricted use of the DMV's fingerprint files by numerous government agencies and private parties[8] to identify individuals without their knowledge or consent. The collection and retention of fingerprints for such unspecified and widespread usage flagrantly disregards the express purpose of the Legislature in enacting the Act. Despite the fact that this type of information clearly falls within the ambit of the Act, there remains one potential obstacle to holding the DMV's fingerprint files within the protective mantle of the privacy legislation.

Section 1798.24, which sets forth the conditions under which "personal information" may be disclosed, includes among its numerous subdivisions, a provision which permits the disclosure of information "[p]ursuant to Article 3 (commencing with Section 1800) of chapter 1 of Division 2 of the Vehicle Code." (§ 1798.24, subd. (m).) Section 1808 of the Vehicle Code provides that "*except as provided in sections 1808.4, 1808.5, 1808.6 and 1808.7, all records of the department relating to* the registration of vehicles, *such other information as is contained on an application for a driver's license,* and abstracts of convictions and of accident reports required to be sent to the department in Sacramento *shall be open to public inspection during office hours.*" Furthermore, Vehicle Code section 1810 authorizes the department to sell information from its records to the general public.

Notwithstanding section 1808's broad language permitting disclosure of the information on a driver's license application, it need not be read to

---

[8]The DMV's fingerprint files are open to use by private investigation services.

permit indiscriminate dissemination of the fingerprint records. Vehicle Code section 1808.5, one of the exceptions to the disclosure requirement, states in relevant part that "[a]ll records of the department *relating to the physical* or mental *condition of any person . . .* are confidential and not open to public inspection." While in the past this provision has generally been applied to protect the confidentiality of what might ordinarily be termed "medical" information—such as information relating to an applicant's eyesight (see 55 Ops.Cal.Atty.Gen. 122 (1972); 26 Ops.Cal.Atty.Gen. 136 (1955))—a reasonable interpretation of the provision affords protection of that portion of a driver's license application that reveals the applicant's fingerprint.

Such an interpretation does not conflict with the statutory language because a fingerprint clearly relates to the "physical condition" of the applicant. Also, it furthers the general underlying purpose of the provision, which is to protect the confidentiality of information revealed by a driver's license application where exposure will improperly infringe the applicant's privacy rights.

Moreover, an interpretation which affords confidentiality to an applicant's fingerprint is supported by the long-recognized principle that statutes are to be construed, if possible, so as to avoid potential constitutional problems. (See, e.g., *Lynch* v. *Overholser* (1962) 369 U.S. 705, 710-711 [8 L.Ed.2d 211, 215-216, 82 S.Ct. 1063], *United States* v. *Delaware & Hudson Co.* (1909) 213 U.S. 366, 407-408 [53 L.Ed. 836, 848-849, 29 S.Ct. 527].) Any other interpretation of the Act's statutory scheme, which would permit the DMV to freely disseminate its fingerprint files to all interested parties, would raise serious concerns under the state constitutional right of privacy. Therefore, Vehicle Code section 1808.5 in conjunction with the protective provisions of the Act must be interpreted to serve as a guard against misuse or improper disclosure of the fingerprint records by the DMV.

Accordingly, this matter is remanded to the trial court, with directions to fashion appropriate declaratory and/or injunctive relief in light of the relevant statutory privacy provisions. In all other respects the judgment of the trial court is affirmed.

Broussard, J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.,** Concurring.—I recognize the importance of the state's interest in ensuring the safe and lawful use of California highways. Therefore, the application procedure currently utilized by the Department of Motor Vehicles must be upheld. However, I write separately to discuss some of the problems

that might occur should our construction of Vehicle Code section 12800, subdivision (c) be circumvented.

Nearly two decades ago, Justice William O. Douglas warned of "an alarming trend whereby the privacy and dignity of our citizens [are] being whittled away by sometimes imperceptible steps. Taken individually, each step may be of little consequence. But when viewed as a whole, there begins to emerge a society quite unlike any we have seen—a society in which government may intrude into the secret regions of man's life at will." (*Osborn* v. *United States* (1966) 385 U.S. 323, 343 [17 L.Ed.2d 394, 406, 87 S.Ct. 429] (dis. opn. of Douglas, J.).)

Six years after these words were written, the people of California amended article I, section 1 of the state Constitution to include among the various "inalienable" rights of "all people" the right of "privacy." The amendment sought to combat "the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society." (*White* v. *Davis* (1975) 13 Cal.3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222].)

In enacting the 1972 privacy amendment, the voters of California presented the courts with a challenging task. The amendment protects the right to informational privacy: "'*Fundamental to our privacy is the ability to control circulation of personal information. . . .* This is essential to social relationships and personal freedom. The proliferation of government and business records over which we have no control limits our ability to control our personal lives.'" (*White* v. *Davis, supra,* 13 Cal.3d at p. 774, quoting the election brochure argument in favor of the privacy amendment, italics in original.)

The privacy amendment also guards against the threat to liberty posed by the marriage of conventional surveillance methods and computer technology: "'The proliferation of government snooping and data collecting is threatening to destroy our traditional freedoms.'" (*Ibid.*)

The dizzying pace of technological progress raises difficult problems for the judiciary. As this court has observed: "Development of photocopying machines, electronic computers and other sophisticated instruments [has] accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devices." (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 248 [118 Cal.Rptr. 166, 529 P.2d 590].)

The United States Privacy Protection Study Commission has warned that this task will not be easy: "In some cases, changes in record-keeping practice have already made even recent legal protections obsolete." (Personal Privacy in an Information Society, U.S. Privacy Protection Study Com. Rep. (1977) p. 10.) Fortunately, the courts may draw assistance from a wealth of thoughtful commentary.[1]

The fingerprint is a uniquely accurate and immutable form of personal identification. When used for narrow purposes and with proper safeguards, it may help to ensure the accuracy of public records—one of the goals of the privacy amendment. (See *White* v. *Davis, supra,* 13 Cal.3d at p. 775.)

However, the very characteristics that make fingerprinting so useful also create cause for concern. Though innocuous by itself, the fingerprint can serve as a "key" to sensitive and potentially dangerous information about a person. As one information expert has explained, "[c]ertain key data . . . are not sensitive per se, but *derive* sensitivity from the information to which one gains access through the key." (Bing, *Classification of Personal Information with Respect to the Sensitivity Aspect,* in Data Banks and Society (First Internat. Oslo Symposium on Data Banks & Society 1972) p. 107 [hereafter *Classification of Personal Information*].)

With current technology, an individual who provides a fingerprint for use in authenticating a personal identification system is ceding the ability to preserve a measure of anonymity in the sensitive areas of his or her life. A fingerprint lifted from the scene of a political meeting or lovers' tryst can be fed into a computer and matched with its owner's identity.[2]

---

[1] The more recent articles include: Soma & Wehmhoefer, *A Legal and Technical Assessment of the Effect of Computers on Privacy* (1983) 60 Den. L.J. 449 (hereafter *Computers and Privacy*); Lautsch, *Computers, Communications and the Wealth of Nations: Some Theoretical and Policy Considerations About an Information Economy* (1983) 4 Computer L.J. 101; Note, *Computers in the Private Sector: Right to Informational Privacy for the Consumer* (1983) 22 Washburn L.J. 469 (hereafter *Right to Informational Privacy*); Note, *The Interest in Limiting the Disclosure of Personal Information: A Constitutional Analysis* (1983) 36 Vand. L.Rev. 139; Landever, *Electronic Surveillance, Computers, and the Fourth Amendment—The New Telecommunications Environment Calls for Reexamination of Doctrine* (1983) 15 U.Tol. L.Rev. 597; Freedman, *The Right of Privacy in the Age of Computer Data and Processing* (1982) 13 Tex. Tech L.Rev. 1361; Comment, *The Constitutional Right To Withhold Private Information* (1983) 77 Nw.U. L.Rev. 536.

[2] The process was explained in a recent professional journal: "Basically, the system reads a *latent* print with a video camera, converting the image to a series of pre-determined mathematical values. These are then stored in the computer's memory bank. . . .

" . . . . . . . . . . . . . . . . . .

"The computer scans through its memory bank, producing a printout that lists, in descending order of probability, the suspects who have fingerprints that match in some detail the original print.

"The computerized system does within minutes what would take a trained fingerprint

Latent fingerprints can be taken from the innumerable pieces of paper used by individuals—for example, political leaflets or personal correspondence. Without effective safeguards, the potential for invasions of privacy is virtually limitless. Any existing protections for a citizen's anonymity could be rendered nugatory.

The present record contains a graphic illustration of the potential for government agencies to surreptitiously lift fingerprints as a means of circumventing privacy rights. Prior to the enactment of the mandatory fingerprint requirement, applicants for driver's licenses were permitted to waive that requirement. Nevertheless, according to declarations submitted by DMV officials, the DMV regularly took latent prints from the applications of persons who had declined to give a thumbprint. Indeed, it was only when the DMV converted its files from paper to microfilm—thus eliminating the possibility of taking latent prints—that the present mandatory requirement was enacted. According to the declaration of one official, this was "[t]he primary impetus behind the legislation making the thumbprint requirement mandatory."

The ballot argument prepared by the drafters of the privacy amendment stated that the right of privacy is essential to several fundamental rights guaranteed by the Bill of Rights, including those guaranteed by the First Amendment. (*White* v. *Davis, supra,* 13 Cal.3d at p. 775.) For this reason, it is appropriate in interpreting the scope of the privacy amendment to consider the long line of First Amendment cases in which the courts have recognized the constitutional value of the freedom to preserve a zone of personal anonymity. (See generally Com., *The Constitutional Right to An-*

---

expert hours or even weeks of manual searching. Even then, the odds of a manual search producing a matching print are infinitesimal. And while a manual search often requires more than just one fingerprint, a computerized system can digest even a *partial* print." (Sullivan, *Computerized Fingerprint System* (Apr. 1984) Police Chief, at p. 50; see Sparrow, *Digital Coding of Single Fingerprints: A New Approach for the Computer Age* (1982) 10 J. Police Sci. & Admin. 206.)

The San Francisco Police Department now owns such a computer system and recently used it to identify and arrest a suspect using a single latent fingerprint left six years earlier. The process took less than an hour. (See *Automated Fingerprint System Solves Record Number of Cases* (May 6, 1984) 15 Crim. Just. Newsletter 6, 7; Sanger, *Fingerprints and Computers,* L.A. Daily J. (May 2, 1984) p. 4, col. 3; see generally *Local Police Advancing in Use of Computers* (Apr. 1985) 16 Crim. Just. Newsletter 1-3.)

The record does not reveal the level of technology currently possessed by the DMV. However, it is clear that the DMV is capable of making identifications solely from latent fingerprints. The supervisor of the latent print section of the Division of Law Enforcement of the Department of Justice stated in a signed declaration that that section frequently uses the DMV files to identify persons from fingerprints. The declaration further reveals that the section's services "are provided to law enforcement agencies, district attorneys' offices, coroners' offices *as well as state agencies throughout California.* The thumb print appearing on the California drivers' licenses has been in many instances the *only source available* in effecting an identification." (First italics added.)

*onymity: Free Speech, Disclosure and the Devil* (1961) 70 Yale L.J. 1084.)

For example, protection has been afforded against government efforts to compel the disclosure of group membership lists since any exposure could inhibit the exercise of the right of association. (See, e.g., *N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449, 462 [2 L.Ed.2d 1488, 1499-1500, 78 S.Ct. 1163]; *Socialist Workers Party* v. *Attorney General of U.S.* (2d Cir. 1974) 510 F.2d 253, 257.)

The courts have also recognized the importance of anonymity for the constitutional right of free expression. For example, in *Talley* v. *California* (1960) 362 U.S. 60 [4 L.Ed.2d 559, 80 S.Ct. 536], the United States Supreme Court held void on its face a Los Angeles city ordinance which prohibited public distribution of any leaflet which failed to list the name of its author. (*Id.,* at p. 65 [4 L.Ed.2d at p. 563].)

In striking down the ordinance, the high court observed that "[t]here can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression. . . . [¶] Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. . . . It is plain that anonymity has sometimes been assumed for the most constructive purposes." (*Id.,* at pp. 64-65 [4 L.Ed.2d at p. 563]; accord *Britt* v. *Superior Court* (1978) 20 Cal.3d 844 [143 Cal.Rptr. 695, 574 P.2d 766] [overbroad judicial discovery order]; *Schuster* v. *Municipal Court* (1980) 109 Cal.App.3d 887 [167 Cal.Rptr. 447] [overbroad ban on anonymous campaign literature]; *Ghafari* v. *Municipal Court* (1978) 87 Cal.App.3d 255 [overbroad ban on use of disguises in public].)

This court has recognized a constitutionally protected zone of anonymity in nonspeech contexts. (*People* v. *Chapman* (1984) 36 Cal.3d 98 [201 Cal.Rptr. 628, 679 P.2d 62].) In *Chapman,* an individual claimed a constitutional privacy interest in maintaining her anonymity as the subscriber to an unlisted telephone number. A unanimous court agreed and held that disclosure of the subscriber's identity "may well add the missing link to make up a 'virtual current biography.'" (*Id.,* at p. 109, quoting *People* v. *Blair* (1979) 25 Cal.3d 640, 653 [159 Cal.Rptr. 818, P.2d 738] and *Burrows* v. *Superior Court, supra,* 13 Cal.3d at p. 247.) Accordingly, it was held

that the police could not obtain this information without prior judicial approval. (*Chapman, supra,* 36 Cal.3d at p. 111.)[3]

*Chapman* disapproved a Court of Appeal decision (*People* v. *Elder* (1976) 63 Cal.App.3d 731 [134 Cal.Rptr. 212]) which had concluded that names and addresses were not protected from warrantless disclosure because they "relate to identification rather than disclosure of private, personal affairs." (*Id.,* at p. 737; *Chapman, supra,* 36 Cal.3d at p. 111, fn. 8.)

Because a fingerprint file may provide an even stronger essential link, there is no comfort in the assurances some courts have offered that fingerprints "provide a simple means of identification; no more."[4]

The logic of recognizing a constitutionally protected privacy interest in an individual's name and address applies with equal or greater force to fingerprints. At stake is the individual's expectation of privacy—specifically, the expectation that he or she may maintain a zone of personal anonymity. That expectation is not abandoned when an individual is required to provide identifying information. Like the name and address given the telephone company in *Chapman* and the financial information given the bank in *Burrows,* the disclosure of the fingerprint required on the application for a driver's license is not volitional. The DMV will not issue anyone a driver's license unless they supply a fingerprint.

An individual can no more participate in the economic life of contemporary society without a driver's license than without a bank account or telephone. (See *Berlinghieri* v. *Department of Motor Vehicles* (1983) 33 Cal.3d 392, 398 [188 Cal.Rptr. 891, 657 P.2d 383]; *Chapman, supra,* 36 Cal.3d at

---

[3]*Chapman* involved an unlawful search and seizure and was decided on the basis of the privacy component of the guarantee against unreasonable search and seizure in article I, section 13 of the California Constitution. However, the opinion spoke in broad terms of "the constitutional right to privacy" (36 Cal.3d at p. 110) and relied on cases upholding privacy claims guaranteed by the First Amendment (*id.,* at pp. 110-111) and by evidentiary privileges (*id.,* at p. 110).

[4]This pithy language appears in the opinion of the federal district court in *Thom* v. *New York Stock Exchange* (S.D.N.Y. 1969) 306 F.Supp. 1002, 1011, affirmed *sub nom. Miller* v. *New York Stock Exchange* (2d Cir. 1970) 425 F.2d 1074, certiorari denied (1970) 398 U.S. 905 [26 L.Ed.2d 64, 90 S.Ct. 1696]. In that case, a New York statute requiring fingerprinting of all employees of securities firms was upheld against a claim that it violated the right of privacy guaranteed by the federal Constitution.

The following "subsequent history" demonstrates the inadequacy of the *Thom* court's analysis. After the lower courts had ruled in favor of the statute's constitutionality, it was learned that "[a]s a result of this statute, several hundred employees have been found to have 'criminal records' and dismissed from their employment; *half of those fired had no record of convictions, but only of arrests.* . . . [¶] . . . [However,] no New York statute provides for automatic dismissal of a securities employee with a past arrest record, . . . ." (Italics added.) (*Menard* v. *Mitchell* (D.C. Cir. 1970) 430 F.2d 486, 495, fn. 52.)

p. 108; *Burrows, supra,* 13 Cal.3d at p. 247.)[5] Thus, by bowing to the fingerprint requirement, an applicant for a driver's license does not abandon his or her expectation of personal anonymity.

Even those who willingly provide a fingerprint should not be deemed to consent to the use of their fingerprint except for the narrow, driving-related purposes for which the DMV may properly require accurate identification. (See *Chapman, supra,* 36 Cal.3d at pp. 106-108; *Blair, supra,* 25 Cal.3d at p. 654; *Burrows, supra,* 13 Cal.3d at p. 247; *People* v. *McKunes* (1975) 51 Cal.App.3d 487, 492 [124 Cal.Rptr. 126].) Here, of course, petitioner expressed her expectation of privacy by refusing to give a fingerprint even though it might cause substantial hardship to herself and her family.

The recognition that the constitutional right of privacy is implicated by the DMV's collection and dissemination of fingerprints is supported by another consideration. Unlike a name and an address, identifiers which an individual repeatedly discloses to private and governmental organizations, fingerprints are rarely requested, required, or knowingly provided. (Cf. *Chapman, supra,* 36 Cal.3d at p. 109; but see *ante,* fn. 2, regarding the DMV's former practice of secretly obtaining latent fingerprints from the applications of those who had elected not to provide an inked print.) Yet, a fingerprint reliably linked with its owner's name and other identifying data may constitute an unprecedentedly powerful and invasive tool of surveillance.

Unless an individual takes the precaution of wearing gloves at all times, a trail of latent fingerprints is left in the places he or she occupies, even if only for brief periods of time. Fingerprints find their way onto personal papers, correspondence, books, telephones and innumerable other objects

---

[5]Vehicle Code section 12800 requires only those persons who wish to drive motor vehicles or to obtain an identification card to be fingerprinted. This limitation scarcely narrows the sweep of the requirement. One could state with equal accuracy—and with equal lack of practical significance—that only those who wish to work must obtain a social security number. The record discloses that the DMV maintains records on approximately 20 million driver's license and identification card applications.

Prior to July 1, 1982, when giving a fingerprint on a driver's license application became mandatory, approximately 10 to 15 percent of applicants chose not to provide one. This is not an insignificant number. Further, even if a majority of applicants did not object to giving a fingerprint, this fact is not dispositive. As this court observed in *Chapman,* "[t]he fact that many customers do not seek to keep their identities . . . private does not in any way diminish the privacy rights of those who do." (36 Cal.3d at p. 108.)

. Nor does the sheer magnitude of the fingerprint collection program alter the inquiry. "Whatever role the expectation of privacy may play in determining the extent of a constitutional right, '. . . the state cannot curtail a person's right of privacy by announcing and carrying out a system of surveillance which diminishes that person's expectations.'" (*Id.,* at p. 113, quoting *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 875, fn. 11 [183 Cal.Rptr. 866, 647 P.2d 142].)

handled in the course of everyday life—or in the course of political meetings, lovers' rendezvous or other activities generating heightened privacy concerns. It is the rare individual who leaves behind a calling card with his or her name and address. Yet a fingerprint, matched against the DMV's files, will yield the same information.

In *White* v. *Davis, supra,* 13 Cal.3d 757, the alleged surveillance activities took a more conventional form. Undercover police agents registered as students at a state university, attended university classes and meetings of campus organizations, and submitted reports to the police department for retention in individual dossiers. (*Id.,* at p. 762.) This court held that the presence of the undercover police agents stripped the students and professors of the protective cloak of anonymity guaranteed by the First Amendment (*id.,* at pp. 767-768)[6] and the state privacy amendment (*id.,* at p. 775).

Here, no such overt surveillance is alleged. However, easily accessible fingerprint files, when combined with sophisticated techniques for lifting latent fingerprints, permit ready identification of individuals participating in controversial or compromising activities. The identification may be made secretly, without the need for direct observation and with a correspondingly reduced chance of discovery.

The advent of computerized fingerprint matching technology makes the DMV's fingerprint file the practical equivalent of the name and address file for unlisted telephone subscribers in *People* v. *Chapman, supra,* 36 Cal.3d 98, or the identification required on the leaflets in *Talley* v. *California, supra,* 362 U.S. 60. This technology had not yet been perfected in 1972, when the privacy amendment was enacted, or in 1975, when this court first interpreted the amendment's scope in *White* v. *Davis, supra,* 13 Cal.3d 757. (See Sanger, *Fingerprinting and Computers, supra,* L.A. Daily J. p. 4, col. 3; Project SEARCH, Report on Latent Fingerprint Identification Systems (1974) p. 12; Project SEARCH, Analysis of Automated and Semi-Automated Systems for Encoding and Searching Latent Fingerprints (1974) p. 6.) However, the voters and this court recognized the general danger posed by the marriage of computers and conventional surveillance methods. (See *ante,* at pp. 195-196; *White* v. *Davis, supra,* 13 Cal.3d at pp. 774-776.)

Not only does the fingerprint provide a "key" for the surveillance of personal activities, but it also supplies a means of linking an individual

---

[6]The creation of dossiers reporting the views expressed in the classes and meetings was also condemned for its inhibitory effect on the exercise of free speech. (*White* v. *Davis, supra,* 13 Cal.3d at pp. 767-768, citing *N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. at p. 462 [2 L.Ed.2d at pp. 1499-1500] and *Talley* v. *California, supra,* 362 U.S. at p. 64 [4 L.Ed.2d at pp. 562-563].)

identified from a fingerprint to the mass of information stored in private and governmental data banks. A fingerprint file enables the user to match a latent fingerprint to a personal number, which in turn can provide access to personal data from farflung sources. As the proponents of the privacy amendment pointed out: "'Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens. Computerization of records makes it possible to create "cradle-to-grave" profiles of every American.'" (Quoted in *White* v. *Davis, supra,* 13 Cal.3d at p. 774.)

Alexander Solzhenitsyn once noted that "'[a]s every man goes through life . . . he fills in a number of forms for the record, each containing a number of questions. . . . There are thus hundreds of little threads radiating from every man.'" (Quoted in Linowes, *Must Personal Privacy Die in the Computer Age?* (1979) 65 A.B.A. J. 1180.) When these threads are woven together, an intimate personal portrait may emerge.

Thoughtful commentators have warned that "as 'life-long dossiers' and interchange of information grow steadily, the possibilities increase that agencies employing computers can accomplish heretofore impossible surveillance of individuals, businesses, and groups *by putting together all the now-scattered pieces of data.*" (Westin, Privacy and Freedom (1967) pp. 366-377, italics added; see also *White* v. *State of California* (1971) 17 Cal.App.3d 621, 631 [95 Cal.Rptr. 175] (conc. & dis. opn. of Friedman, J.).)

In short, a fingerprint file can provide both a direct means of identifying individuals against their will and an indirect means for obtaining a wealth of personal information about them. Accordingly, fingerprints have been described as "sensitive" information, in contrast to less sensitive identification information such as a name or a date of birth. (*Classification of Personal Information, supra,* at pp. 108, 116.)

Individuals are constantly faced with requests for personal and sensitive information from a wide variety of government agencies and private organizations. In many cases, this information is essential to the provision of needed services. (See generally, *Right to Informational Privacy, supra,* 22 Washburn L.J. at p. 470; *Computers and Privacy, supra,* 60 Den. L.J. at pp. 449-450.) The collection and storage of fragmentary bits of information and their use for narrowly specified purposes do not necessarily pose a serious threat to individual privacy, provided there are adequate safeguards against misuse and unwarranted disclosure.

In *White* v. *Davis, supra,* 13 Cal.3d at page 775, this court enumerated the principal evils at which the privacy amendment was directed: "(1)

'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records."

Petitioner's challenge focuses on the third concern. She concedes that the DMV could properly require fingerprinting if the prints were used solely for the purpose of authenticating drivers' licenses.

However, the fingerprint requirement was enacted for broader purposes. In enacting the challenged provision, the Legislature declared its intent to create a statewide fingerprint-based identification system. (See majority opn., *ante,* at p. 193.)

The constitutional guarantee of privacy requires that information about an individual be used solely to achieve the *specific* purposes for which it was obtained. (*White* v. *Davis, supra,* 13 Cal.3d at p. 775.) However, the stated purpose of the fingerprint requirement—accurate personal identification—is so broad that it imposes no effective constraint on subsequent use. It is as if the use of a gun were "limited" to the purpose of shooting. By nature, fingerprints are invariably and solely useful for accurate identification.

Moreover, the requirement directly implicates the privacy amendment's protection against the "disclosure of [information] to some third party." (*Ibid.*) As noted above, fingerprints can be used to identify individuals without their consent or knowledge. Although the fingerprints are collected by the department primarily for department purposes, a wide variety of agencies and private parties regularly use the files to identify persons from fingerprints. (See majority opn., *ante,* at p. 193.)

The collection of fingerprints for such unspecified and widespread usage infringes on individual privacy rights. No person should be compelled to provide the state with such a potent instrument of control absent effective safeguards against misuse.[7]

---

[7]As construed in the majority opinion, the statute authorizes the department to collect fingerprints for its internal use in authenticating the identity of driver's license applicants. However, this statute, effectively enforced, would not answer petitioner's objection to the use of the prints to authenticate the driver's license number as a universal statewide identifier, increasing the number's usefulness for linking personal information from different computerized data bases. Inevitably, the department's internal use of the prints to ensure the accuracy of its driver records also serves to increase the reliability and utility of the driver's license number for identification and data-matching by outside government agencies, businesses, and individuals. In light of the difficulty of verifying that the fingerprint files are not freely disseminated to private parties, I want to emphasize that any unauthorized dissemination would clearly be an egregious violation of the applicant's right to privacy under the state Constitution.

The reflections of Justice Brennan concerning the challenge of constitutional interpretation in a rapidly changing world are particularly germane. "[T]he genius of our Constitution resides not in any static meaning that it had in a world that is dead and gone, but in the adaptability of its great principles to cope with the problems of a developing America. A principle to be vital must be of wider application than the mischief that gave it birth. Constitutions are not ephemeral documents, designed to meet passing occasions. The future is in their care, and therefore, in their application, our contemplation cannot be only of what has been but of what may be." (Brennan, *State Constitutions and the Protection of Individual Rights* (1977) 90 Harv. L.Rev. 489, 495.)

**MOSK, J.**—I dissent.

Although I agree with the majority that the Department of Motor Vehicles (DMV) may constitutionally require applicants for driver's licenses to submit fingerprints, I cannot join either in their unconvincing analysis or in their novel disposition. I do not believe that the DMV's fingerprint data are made confidential by the Information Practices Act of 1977 (the Act) (Civ. Code, § 1798 et seq.): the plain language of the relevant provisions of the Act explicitly states otherwise. At the same time, I do not believe that the consequent nonconfidentiality of such data will inevitably compromise the applicant's right to privacy.

I yield to no one in demanding respect for the tranquility of the fireside and the inviolability of the person. The problem with the reasoning of the duplicative opinions of the Chief Justice is that neither the hearth nor the person of this individual would actually be threatened, less still violated, by nonconfidentiality of her DMV fingerprint records: at most, plaintiff merely suspects that if the DMV does not keep her thumbprint secret something possibly adverse might happen to someone, by act of someone in some authoritative position, at some vague time in the future. These are hardly the definitive ingredients out of which a judgment can or should be fashioned. More important, such speculation is a precarious hook on which to hang a decision questioning the constitutionality of a legislative plan founded on a rational state policy.

I would hold simply that the fingerprint requirement does not violate due process under the appropriate standard of substantive review, i.e., the rational basis test, and that in the present context, in which abuse or misuse of the fingerprint data has not been demonstrated *or even alleged,* the requirement does not constitute a significant invasion of an applicant's right to privacy. Rather than expatiating gratuitously on the abstract right to privacy in the computer age, I would refrain from premature conclusions

about potential misuse, yet leave open the possibility of a future challenge to any actual and specific abuse of fingerprint records by the DMV, other governmental agencies, or private enterprises.

My disagreement with the Chief Justice's twin opinions is thus twofold. I dispute her strained exercise in statutory construction; and I reject her warning that if the construction is circumvented, the privacy interests of driver's license applicants will inevitably be imperiled.

First, the majority argue unpersuasively that the drafters of the Act intended to include the fingerprints of applicants for driver's licenses among the protected "personal information" that must be held confidential by the DMV. I agree that under the Act fingerprints fall in the category of "personal information" that "identifies or describes" an individual, because it is part of the "physical description" of that individual. (Civ. Code, § 1798.3, subd. (a).) However, the Act explicitly permits disclosure of any such personal information "Pursuant to Article 3 (commencing with Section 1800) of Chapter 1 of Division 2 of the Vehicle Code." (*Id.,* at p. 1798.24, subd. (m).)

One of the cited sections of the Vehicle Code expressly declares that the information in an application for a driver's license "shall be open to public inspection during office hours." (Veh. Code, § 1808.) The only exceptions provided by the Legislature to this broad right of public access are for the home addresses of certain officials (§ 1808.4), records relating to the physical or mental condition of any person and convictions of offenses involving controlled substances (§ 1808.5), and records of certain convictions (§ 1808.6) and dismissals (§ 1808.7) of traffic offenses. Fingerprints, of course, are not expressly listed in any of these limited exceptions.

The majority attempt to fill this gap by calling a fingerprint a "physical condition." They concede, however, that heretofore the quoted phrase has consistently been understood to refer to *medical* records. (55 Ops.Cal.Atty.Gen. 122 (1972); 26 Ops.Cal.Atty.Gen. 136 (1955).) In a virtuoso feat of bootstrapping, they argue that they are constrained to interpret "physical condition" to include fingerprints because to do otherwise would assertedly violate the state constitutional right to privacy. They also claim their construction furthers the purpose of the provision to avoid infringing on an applicant's privacy rights.

I cannot see how fingerprints, any more than an applicant's age and sex, weight and height, hair and eye color, can be understood to be a "physical condition" within the meaning of the statute. The information protected by that phrase is, rather, the medical results of tests for impaired visual acuity

or hearing, alcoholism, drug dependency, and diseases or disabilities affecting an applicant's mental and physical fitness to operate a motor vehicle. (See Veh. Code, §§ 12804, 12805.) By contrast, fingerprints relate only to identification: like sex, height, and eye color, they have no bearing whatever on the applicant's ability or fitness to operate a motor vehicle. It follows they are not the kind of medical information that the Legislature regarded as too private to be made available to the public. "When statutory language is thus clear and unambiguous there is no need for construction, and courts should not indulge in it." (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].)

Moreover, I do not share the majority's fear that any dissemination of fingerprints by the DMV is necessarily unconstitutional. The DMV fingerprint files have proved invaluable, for example, to coroners for identifying deceased persons and to the Federal Bureau of Investigation's disaster teams for identifying victims of major disasters. Such uses of the fingerprint files serve the individual and his family as well as the public, and offend no reasonable interest in privacy. The conduct of the DMV in this regard is not covert or secret, and does not constitute the kind of governmental intrusion we condemned in *White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].

I do not question the sincerity of this petitioner. Nor am I unaware that some thoughtful citizens have an aversion to any fingerprinting or photographing by the government; many of them analogize such procedures to the identity cards required by repressive foreign regimes. There are, however, significant distinctions. In those foreign regimes a universal identification card must be carried at all times and displayed to any government functionary upon demand; it is often a tool for achieving Orwellian political control. By contrast, a California driver's license need not be in anyone's possession at any time, except when the licensee is actually operating a motor vehicle on a highway. (Veh. Code, § 12951.)

Despite the exaggerated apprehensions of the Chief Justice, fingerprints do not convey the type of information that would make their collection or dissemination constitutionally suspect. They do not divulge the history, thoughts, habits, political views, activities, or financial affairs of a person, as might an account of credit card purchases (*People* v. *Blair* (1979) 25 Cal.3d 640, 652 [159 Cal.Rptr. 818, 602 P.2d 738]), a bank statement (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 247 [118 Cal.Rptr. 166, 529 P.2d 590]), bank loan records and customer information (*Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 657-658 [125 Cal.Rptr. 553, 542 P.2d 977]), or an academic transcript (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825 [134 Cal.Rptr. 839]). To the contrary,

a fingerprint is merely an additional means of identifying the applicant, like age, sex, weight, height, hair and eye color—all of which, I note, this petitioner is perfectly willing to reveal. As the court explained in *Thom* v. *New York Stock Exchange* (S.D.N.Y. 1969) 306 F.Supp. 1002, 1011: "Possession of an individual's fingerprints does not create an atmosphere of general surveillance or indicate that they will be used for an impermissible purpose. Fingerprints provide a simple means of identification; no more."

If and when this or any other petitioner can demonstrate—or even convincingly allege—improper use of personal data by a state agency, I will be out in front with my colleagues in insisting on protecting the privacy of all Californians. In the meantime, I am unwilling to join the Chief Justice in broadly assuming, without proof or allegation, the worst possible scenario: that agencies of our state government will inevitably and deliberately violate the constitutional rights of this petitioner.

Lucas, J., concurred.